[L. A. No. 14359. In Bank.—October 1, 1934.]

JEANETTE P. PHILPOTT, as Administratrix, etc., Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

Edwin J. Miller for Petitioner.

Everett W. Mattoon, County Counsel, and S. V. O. Prichard, Deputy County Counsel, for Respondents.

PRESTON, J.—By this proceeding in prohibition we are required to declare the nature of the two causes of action pleaded in the case of *John Philpott, Plaintiff*, v. *Broadway State Bank et al., Defendants*, No. 292646, now pending in the Superior Court of the County of Los Angeles. Petitioner asserts that the cause is one in equity of which the superior court alone has jurisdiction and that unless it is restrained by this writ, said superior court will attempt to divest itself of jurisdiction of the cause by holding that the action is one at law, involving a sum less than $2,000, to wit: $625, cognizable alone by the municipal court of said county.

The far-reaching importance of this inquiry is seen when it is remembered that the jurisdiction of both the appellate and the trial courts is directly affected by the answer thereto. The right of trial by jury and, to a certain extent, the right of attachment may also be affected.

It is almost superfluous to preface this discussion with the statement that although we have but one form of action, and practically but one forum, under our system of state jurisprudence, yet in applying the relief allowable we must adhere to the distinctions commonly accepted as existing between actions at law and actions in equity. In *DeWitt* v. *Hays*, 2 Cal. 463, 469 [56 Am. Dec. 352], the court uses this language: "The legislature in providing that 'there shall be but one form of civil action', cannot be supposed to have intended at one fell stroke to abolish all distinction between law and equity, as to actions. Such a construction would lead to infinite perplexities and endless difficulties. The innovation extends only to the form of action, and the pleadings, while the technicalities of plead-

ing have been dispensed with; and the plaintiff need only state his cause of action in ordinary and concise language, whether it be in *assumpsit*, trespass, or ejectment, without regard to the ancient forms; still the distinction between those actions has not been abolished, but remains the same. So cases legal and equitable have not been consolidated, and though there is no difference between the form of a bill in chancery, and a common law declaration, under our system, where all relief is sought in the same way from the same tribunal; the distinction between law and equity is as naked and broad as ever. To entitle the plaintiff to the equitable interposition of the Court, he must show a proper case for the interference of a Court of Chancery, and one in which he has no adequate or complete relief at law.''

See to the same effect *Hallidie* v. *Enginger,* 175 Cal. 505, 506 [166 Pac. 1], where the court said: ''The next general consideration is that legislatures in establishing the simplified code pleading and in thus abolishing the *forms* of common-law actions did not destroy, and even if it had desired could not destroy, the essential *characteristics* of those actions so long as the common law remains the basis of our jurisprudence.'' In this connection we should repeat also that the common law of England is, except where modified by Constitution or statute the rule of decision in this state. (Pol. Code, sec. 4468; *Martin* v. *Superior Court,* 176 Cal. 289 [168 Pac. 135, L. R. A. 1918B, 313].)

We are thus brought to consider the *criteria* by which we may distinguish between an action at law and one in equity. The forum, form of action, and mode of proof are no longer factors in view of the already noted court system and procedure. In reality the distinction between the two classes of remedies is more or less arbitrary and groundless. It is well said also that the courts of equity are reaching into new fields of operation and the courts of law are encroaching upon the former territory of the courts of equity. This thought was expressed by Lord Redesdale as quoted in the case of *Spect* v. *Spect,* 88 Cal. 437, 442 [26 Pac. 203, 22 Am. St. Rep. 314, 13 L. R. A. 137], as follows: ''The distinction between strict law and equity is never in any country a permanent distinction. Law and equity are in continual progression, and the former is constantly gaining ground upon the latter. A great part of what is now

strict law was formerly considered as equity, and the equitable decisions of this age will unavoidably be ranked under the strict law of the next." See *Spect* v. *Spect, supra,* and *Barbour* v. *Flick,* 126 Cal. 628, 634 [59 Pac. 122].

We must therefore find the distinction between the two forms of action in their history and development rather than in their intrinsic differences in theory or philosophy. The two forums were set up under the English system to complement each other in the field of remedial justice, actions at law occupying a portion of the field; and actions in equity, supplying the defects in the legal system, occupied the remainder of the field. In its last analysis, therefore, the difference between the two actions lies largely in the mode of relief granted and to determine whether the action is of one type or another, one must of necessity resort to the apposite English law on the subject. Mr. Blackstone (Cooley's Blackstone, 4th ed., vol. II, pp. 1181, 1182, sec. 436) in this connection, says: "The rules of decision are in both courts equally apposite to the subjects of which they take cognizance. . . . The difference between courts of law and equity.—Such then being the parity of law and reason which governs both species of courts, wherein (it may be asked) does their essential difference consist? *It principally consists in the different modes of administering justice* in each; in the mode of proof, the mode of trial and the mode of relief. . . . " Therefore, to give a proper classification to a cause of action we should seek to find its counterpart in the history of the English law in the light of such modifications thereof as have taken place under our own system.

This brings us to the counts of the complaint here in question. They are two. Count one declares that plaintiff paid to the defendants $625 on account of a contract to purchase stock of defendant bank to be thereafter issued by it; that plaintiff later discovered that the stock, if and when issued, would be worthless and that the financial condition of the bank and other material facts and circumstances had been fraudulently represented to him, giving in detail the nature of the misrepresentations made, and closing with the allegation that said fraudulent representations were the sole inducing cause of the agreement to purchase and the payment of said sum; finally pleading that plaintiff had rescinded said transaction in the manner provided by the

code. The second count is merely one of the common counts for money had and received, to wit: *indebitatus assumpsit*. The prayer is for return of the $625 to plaintiff, with interest and costs, "and for such other and further relief as may be just and equitable".

Count one, of course, contains allegations of fraud but courts of law, as well as courts of equity, have jurisdiction to give relief in certain specified cases of fraud. (*Fish* v. *Benson,* 71 Cal. 428, 435 [12 Pac. 454].) Under the peculiar facts in this case a judgment for plaintiff in the sum of $625, with interest and costs, would fully satisfy his demands. In short, he asks no relief that a court of law may not in all respects give him. This, of itself, would seem sufficient to deny plaintiff a place in a court of equity. In *Morrison* v. *Land,* 169 Cal. 580, 586, 587 [147 Pac. 259], the court said: "Passing without discussion other requisites, it is elementary that where, as here, the primary right of a party is *legal* in its nature, as distinguished from *equitable,* and one for which the law affords some remedy, as here damages by way of compensation for breach of contract, a proper exercise of the equitable jurisdiction will not give equitable relief in any case where the legal remedy is full and adequate and does complete justice. No principle of equitable jurisprudence is more firmly established than this. . . . In so far as cases of the character of the one before us are concerned, the very basis of the granting of equitable relief is the conclusion in view of the circumstances of the particular case that full and adequate compensation cannot be had at law. Certainly no case has been cited to us, and we know of none, in which such relief has been given where it was apparent that full and adequate compensation can be given at law." (See, also, 10 Cal. Jur., p. 465, sec. 7.) A judgment of rescission in this cause would be entirely superfluous. (*Prewitt* v. *Sunnymead Orchard Co.,* 189 Cal. 723, 732 [209 Pac. 995].)

If the action is not one in equity, it follows, of course, that it is an action at law. It seems material, however, at this time to determine under what common-law species of action this complaint should be classified. It is not a case of express promise, as an action in debt; although it is for a sum certain, for it lacks the element of an express promise to pay. Neither is it an action in which there is in fact

an implied promise to pay, for there is no privity of contract from which to imply such a promise. In reality, it is an action in which the law, in order to prevent the unjust enrichment of defendants from the property of plaintiff, itself implies a promise to repay the sum demanded. In other words, it is an action in *assumpsit* upon a promise implied by law. That is, it is a case where the plaintiff has not elected to sue for damages, general or special or both, which he may have suffered from the tort inflicted upon him by defendants; likewise it is not a case where the plaintiff is seeking the application of equitable remedies to redress his grievances. All these elements, which may have been shown by appropriate allegations for such relief, are conspicuously absent. Plaintiff apparently is content to merely seek a return from defendants of money given them, with interest, forgetting and foregoing all other elements of injury. Is it not plain, therefore, that he has waived the tort of defendants and has come into court relying solely upon the promise created by law to return to him the consideration paid upon the contract?

█ Count two is one of the common counts for money had and received, commonly styled *indebitatus assumpsit.* We then have two actions for *assumpsit,* one on a special count and one on a common count. These counts may properly be united in the same action. (5 C. J. 1399.) A case where a special and a common count in *assumpsit* for fraud were united in one action is *First Nat. Bank* v. *Steel,* 136 Mich. 588 [99 N. W. 786].

The action of *assumpsit,* in its development, had an interesting but stormy career at the common law. Although in existence for some years previous to that time, it came into prominence following the decision in Slade's Case in 1603 (Coke's Rep., vol. 2, p. 505; 2 Harvard Law Review, p. 16). It gradually gained prominence and widened in scope until 1760 when Lord Mansfield, in the case of *Moses* v. *Macfarlan* (2 Burr. 1005, English Reports, Full Reprint, King's Bench Book 26, vol. 97, p. 676), described its function as follows: "This kind of equitable action to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, *ex aequo et bono,* the defendant ought to refund; it does not lie for money paid by the plaintiff, which

is claimed of him as payable in point of honor and honesty, although it could not have been recovered from him by any course of law; as in payment of a debt barred by the statute of limitations, or contracted during his infancy, or to the extent of principal and legal interest upon a usurious contract, or, for money fairly lost at play: because in all these cases, the defendant may retain it with a safe conscience, though by positive law he was barred from recovering. But it lies for money paid by mistake; or upon a consideration which happens to fail; or for money got through imposition (express or implied); or extortion; or oppression; or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances. In one word the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.''

Quoting the above, Mr. Holdsworth in his work on the History of English Law, volume 8, page 97, uses this language: "It was thus in the action of *indebitatus assumpsit* that the larger part of our modern law of *quasi*-contract has originated."

See, also, Cooley's Blackstone, fourth edition, volume II, page 975, section 162, where it is said: "It lies for money paid by mistake, or on a consideration which happens to fail, or through imposition, extortion, or oppression, or where any undue advantage is taken of the plaintiff's situation." Also, see 1 Chitty on Pleading, section 100.

Clark on Contracts, fourth edition, Hornbook Series, pages 699, 700, dealing with the subject of *quasi*-contracts, uses the following language: "A frequent illustration of a *quasi*-contractual obligation of this kind arises where a person obtains another's money by wrongful or fraudulent means. Where one person has wrongfully taken another's money, or has taken his property and converted it into money, the latter has a right of action *ex delicto* for the wrong done to him, as by an action of trespass or trover, or by an action on the case for the fraud. He is not always restricted, however, to an action *ex delicto* for the specific wrong, but may in general waive the tort, and sue in *assumpsit* for the money as for money received for his use. . . . Where a person steals another's money or property, or obtains it

by false pretenses, the fact that a crime has been committed will not prevent a civil action by the person injured. He may sue the thief in tort, or he may elect to sue in *assumpsit* as for money received for his use. The same is true in any case in which one person, by means of trespass, fraud, or other tortious means obtains another's money."

This doctrine is also expressly indorsed in *Hallidie* v. *Enginger, supra* (175 Cal., at p. 508) : "In some instances the action on implied contract does not in truth rest upon contract at all. In others, the contract may lie at the base of the wrong or may have enabled the perpetrator to have accomplished his wrong. Thus, where A delivers goods to B at B's request, even though B never meant to pay for them, the law erects the legal fiction that he promised to pay, and he will not be heard to deny it in the action for *quantum valebat* in *assumpsit*. But upon the other hand, if B stole A's watch, A could treat the theft as a contract of sale and sue in like manner *ex contractu,* though in fact there was no foundation whatsoever for the fiction other than the need of broadening A's remedies. (*Downs* v. *City of Baltimore,* 111 Md. 674 [19 Ann. Cas. 644, 41 L. R. A. (N. S.) 255, 76 Atl. 861].) Or again, if B, in the employ of A, misappropriates his money or property, while A could sue *ex delicto* for the wrong, he could, on the other hand, waive the tort and sue, again depending upon the nature of the property converted, either for the value, for goods sold and delivered, or for money had and received. (Citing cases.)"

See Page on Contracts, volume 3, page 2510, section 1473, also pages 2671–2673, section 1548, where it is said: "If money has been paid under such contract, the right of the party defrauded to waive the tort and recover such payment on the theory of an implied contract, in general *assumpsit,* is very generally recognized. It is not necessary that the fraud should be the sole cause of the payment. It is sufficient if the payment would not have been made if it were not for such fraud. . . . The right to recover in *assumpsit* assumes that on discovering the fraud the party defrauded elects to disaffirm the express contract. . . . "

Authorities in support of the prevalent use of this form of action in the courts of the common law could be multiplied indefinitely, but we will close this branch of the discussion by a quotation from Professor Ames in volume 2 of the

Harvard Law Review, page 69: "The main outlines of the history of *assumpsit* have now been indicated. In its origin an action of tort, it was soon transformed into an action of contract, becoming afterwards a remedy where there was neither tort nor contract. Based at first only upon an express promise, it was afterwards supported upon an implied promise, and even upon a fictitious promise. Introduced as a special manifestation of the action on the case, it soon acquired the dignity of a distinct form of action, which superseded Debt, became concurrent with Account, with Case upon a bailment, a warranty, and bills of exchange, and competed with Equity in the case of essentially equitable *quasi*-contracts growing out of the principle of unjust enrichment. Surely it would be hard to find a better illustration of the flexibility and power of self-development of the Common Law."

Considerable confusion now exists among the bench and bar as to the proper classification of this cause of action, due to the fact that the courts of law administering this relief apply equitable principles and to the further fact that certain expressions found in court opinions and text-books, on first impression, might seem to classify it as an action in equity. But from what has been said it is clearly one of a special class of cases limited to a specific set of facts which could by supplementary allegations be made an out and out action in equity or else an action *ex delicto* at law. Such words as "equitable relief" and "equitable action", found in court opinions, have added to this confusion. For example, in the case of *Stone* v. *Superior Court,* 214 Cal. 272 [4 Pac. (2d) 777, 77 A. L. R. 743], is found this statement referring to the complaint, that it " . . . clearly and unmistakably set forth a cause of action for equitable relief . . . "

The following authority would seem to effectually dispel all doubt in this connection:

"Money Had and Received; General nature of right. If A receives money which belongs to B, under circumstances which give A no right thereto, but which bind A on principles of justice and fairness to repay such money to B, the common law allowed B to sue as on contract, although there was no express contract and no real implied contract, in order to prevent A's unjust enrichment at B's expense.

This principle has survived in our law, and an action as upon contract will lie for money had and received wherever one person has received money which belongs to another, and which in 'equity and good conscience', or in other words, in justice and right, should be returned. Since the contract alleged in the plaintiff's complaint is often purely fictitious, the plaintiff's right to recover in a contract does not depend upon any principles of privity of contract between the plaintiff and the defendant, and no privity is necessary. The plaintiff's right to recover is governed by principles of equity, although the action is one at law." (Page on Contracts, *supra,* vol. 3, pp. 2510–2512, sec. 1473.)

In the case of *Chapman* v. *Forbes,* 123 N. Y. 532 [26 N. E. 3], decided in 1890, the question at issue was whether the action for money had and received was one in equity or one at law. Holding that it was an action at law, the court said: " . . . the action has been frequently stated to be an 'equitable one'; that is, one depending upon general principles of equity for the maintenance of the plaintiff's claim to the money. . . . But, although the action may be generally described as one of an equitable character, it never was in any aspect a suit in equity. . . . That an action is of an equitable nature does not make it an action in equity. . . . When, in an action for money had and received, all the facts show that the plaintiff is *ex aequo et bono* entitled to recover, his right to recover is a legal one, and maintainable in a court of law. . . . "

In *Davison* v. *West Oxford Land Co.,* 126 N. C. 704, 709 [36 S. E. 162], the court said: " . . . And, where one party has received money to which another is entitled, the law presumes a contract if it is necessary to do so to enable the party entitled to recover the same. *Board of Education* v. *Town of Henderson,* 126 N. C. 689 [36 S. E. 158], decided this term. This entitles the party having the right to the money, to an action of debt, *indebitatus assumpsit,* which, though an action at law, was equitable in its nature. It has been styled 'an equitable action on the law side of the docket'. But it arises only where the money was received and held under such circumstances that the law will imply the contract. Where it would be inequitable and unconscionable for the party receiving the money to hold it, amounting to a moral fraud to do so, it will usually be so

held. Where one person receives money belonging to another, and wrongfully refuses to pay it over, the action will lie.''

In *Steuerwald* v. *Richter*, 158 Wis. 597 [149 N. W. 692], it was said: ''The complaint is for money had and received. Although the action is legal in form, the right to recover is in its nature equitable, and can only be enforced where the defendant has received money which in equity and good conscience he ought to pay to the plaintiff.''

In *Board of Highway Commissioners* v. *City of Bloomington*, 253 Ill. 164, 174 [97 N. E. 280, Ann. Cas. 1913A, 471], the Supreme Court of Illinois said: ''The action of *assumpsit*, under the common counts for money had and received, is an appropriate remedy to enforce the equitable obligation arising from the receipt of money by one person which belongs to another and which in equity and justice should be returned. (*Gaines* v. *Miller*, 111 U. S. 395 [4 Sup. Ct. 426, 28 L. Ed. 466] ; *Pauly* v. *Pauly*, 107 Cal. 8 [40 Pac. 29, 48 Am. St. Rep. 98] ; *Brown* v. *Woodward*, 75 Conn. 254 [53 Atl. 112] ; *Wilson* v. *Turner*, 164 Ill. 398 [45 N. E. 820].) The action is in form *ex contractu*, but the alleged contract being purely fictitious, the right to recover does not depend upon any principles of privity of contract between the plaintiff and the defendant and no privity is necessary. (2 Page on Contracts, sec. 789, and cases there cited.) The right to recover is governed by principles of equity, although the action is at law. The action is maintainable in all cases where one person has received money or its equivalent under such circumtances that in equity and good conscience he ought not to retain it and which *ex acquo et bono* belongs to another. (*Jackson* v. *Hough*, 38 W. Va. 236 [18 S. E. 575] ; *Merchants' & Miners' Nat. Bank* v. *Barnes*, 18 Mont. 335 [45 Pac. 218, 56 Am. St. Rep. 586, 47 L. R. A. 737].) ''

▇ Confusion has also arisen respecting the form of action under count one in that there are found therein allegations of a rescission of the agreement by the party injured and notice thereof given to the defendant by the plaintiff himself pursuant to sections of the Civil Code of this state on that subject. It is undoubtedly true that a litigant may invoke the power of a court of equity to effect a rescission which has not theretofore been made. This is

especially provided for by Civil Code, sections 3406–3408, inclusive. But where the plaintiff himself has pursued the method provided by sections 1688–1691 of the Civil Code to effect a rescission of the contract he may come into a court of law for all the relief that court is competent to give, and in the instance where he merely asks for a return of the consideration parted with by reason of the fraud, mistake, failure of consideration or ·any other set of facts authorizing rescission, he is entitled to the action of *assumpsit*. Indeed, section 1712 of said code seems to provide for a legal action in a case such as we have here under consideration. The rule that it is not necessary to ask the aid of a court of equity to effect the rescission where the rescinding party has followed the statutory procedure, finds abundant support in California decisions.

In this connection we approve the opinion of Judge Bishop in the case of *Jensen* v. *Harry H. Culver & Co.*, 127 Cal. App. (Supp.) 783, 785, 786 [15 Pac. (2d) 907], where many of the authorities are cited as follows: ''There can be no doubt that one having a right to rescind need not turn to the courts to have the rescission accomplished; he may effect it by his own action. (*Prewitt* v. *Sunnymead Orchard Co.*, [1922] 189 Cal. 723 [209 Pac. 995], *McNeese* v. *McNeese,* [1923] 190 Cal. 402 [213 Pac. 36], *Maxwell* v. *Jimeno,* [1928] 89 Cal. App. 612 [265 Pac. 885], and *Ito* v. *Watanabe,* [1931] 213 Cal. 487 [2 Pac. (2d) 799].) The reluctant response of him as to whom the contract was rescinded may require the help of a court to secure to him, who rescinded, the relief to which he has become entitled. This relief may be such that only a court of equity can furnish it. For examples, see *Mesenburg* v. *Dunn,* (1899) 125 Cal. 222 [57 Pac. 887], and *Rocha* v. *Rocha,* (1925) 197 Cal. 396 [240 Pac. 1010]. The relief sought may, however, be the return of personal property. In such case the action commonly known as claim and delivery is appropriate. (*McNeese* v. *McNeese, supra.*) This, of course, is an action at law. (See *Faulkner* v. *First Nat. Bank,* [1900] 130 Cal. 258 [62 Pac. 463].) If money alone has been transferred by the rescinding party, upon the rescission the law implies a promise to return it, which becomes the basis for a common-law action of money had and received. (*Rand* v. *Columbian Realty Co.,* [1910] 13 Cal. App. 444 [110 Pac.

322]; *Winkler* v. *Jerrue,* [1912] 20 Cal. App. 555 [129 Pac. 804]; *Fontaine* v. *Lacassie,* [1918] 36 Cal. App. 175 [171 Pac. 812]; *Bridges* v. *Fisk,* [1921] 53 Cal. App. 117 [200 Pac. 71]; *Firpo* v. *Pacific Mut. Life Ins. Co.,* [1926] 80 Cal. App. 122 [251 Pac. 657].)'' See, also, *Hull* v. *Ray,* 211 Cal. 164, 167 [294 Pac. 700].

To the above should be added the further statement that the plaintiff may not only waive the tort and sue in *indebitatus assumpsit* for the money consideration parted with but, where personal goods have been thus converted, he may also have the common-law writ (*quantum valebat*) for the value of the goods so converted. (*Bechtel* v. *Chase,* 156 Cal. 707, 711 [106 Pac. 81], citing *Roberts* v. *Evans,* 43 Cal. 380; *Lehmann* v. *Schmidt,* 87 Cal. 15 [25 Pac. 161], and *Chittenden* v. *Pratt,* 89 Cal. 178 [26 Pac. 626].) Indeed, under the facts here present, no rescission would seem to be required other than the initiation of the action itself as plaintiff has received nothing of value belonging to the defendants (*S. C. V. Peat Fuel Co.* v. *Tuck,* 53 Cal. 304; *Richter* v. *Union Land & Stock Co.,* 129 Cal. 367 [62 Pac. 39]), and, moreover, the common-law action of debt might lie also in such case.

█ The above discussion disposes of all the material elements of the subject under review except the question whether or not such a cause of action sounds in contract or in tort. It would seem clear, however, from what has already been pointed out that it is a cause of action, which although originally sounding in tort, has now become fully *ex contractu* by a process of slow but steady development. Quoting from Holdsworth's History of English Law, volume 7, page 441: ''The earliest of these actions of the case to acquire a distinct character was the action of *assumpsit.* We have seen that it became the contractual action of the common law; and that its clear separation from the delictual actions was marked by the decision, arrived at in the sixteenth century, that the maxim *actio personalis moritur cum persona* did not, as a rule, apply to it. On the other hand, we have seen that it could be and was used as an action in tort. And we shall see that its extension, at the end of the seventeenth century, to cover a part of the sphere occupied by trover; and its extension, at the end of the eighteenth century, to enforce the repayment of money

where it was equitable that money should be repaid, created the law of *quasi*-contract, and thus gave it in many cases a semi-proprietary character. But though *assumpsit* thus retained certain of its delictual characteristics, though in its application to the law of *quasi*-contract it acquired certain proprietary characteristics, its contractual quality was always its most distinct feature. Of all the actions on the case it departed the most markedly from its delictual origin.''

Quoting also from Holdsworth's History of English Law, volume 3, page 451: ''It was Slade's Case which fixed the character of the action of *assumpsit;* for, as we have seen, it enabled it to absorb the greater part of the sphere occupied by the action of debt, and to become a remedy for the breach of purely executory contracts. From henceforward it was the contractual action of the common law. . . . ''

We therefore hold this action to be one at law and one, by reason of the amount involved, of which the municipal court alone has jurisdiction.

The only further matter requiring discussion is that in the court below when the trial judge had signified his intention to hold that the action was one in law and not properly within the jurisdiction of the superior court, but within the jurisdiction of the municipal court, the petitioner offered to amend his complaint to show the case was one where plaintiff should be given punitive damages in the sum of $1500, which amendment, if allowed, would have increased the *ad damnum* clause to a sum in excess of $2,000, and the cause would then be within the jurisdiction of the superior court regardless of the nature of the action. The court, in the exercise of its discretion, denied the application to amend in this particular. On the face of the proffered amendment, which asked nearly three times the amount in suit, the court was justified in holding it was clearly an attempt to retain the cause in the superior court without regard to the substantiality of the amendment. In this ruling the court did not err.

The alternative writ of prohibition is discharged.

Waste, C. J., Spence, J., *pro tem.*, Langdon, J., and Seawell, J., concurred.

Curtis, J., and Shenk, J., dissented.