T. JOE ANDERSON, et al.,

*Plaintiffs and Respondents,*

vs.

K. W. BELL, ANTHONY J. SARGEANT, J. R. HOL-
COMB, JACOB KREIGER, and JAMES P.
HORISKEY,

*Defendants and Appellants.*

(No. 2562; December 16th, 1952; 251 Pac. (2d) 572)

For the defendants and appellants the cause was submitted upon the brief of James P. Horiskey and Donald M. Starnes, both of Cheyenne, Wyoming, and oral argument by Mr. Horiskey.

For the plaintiffs and respondents the cause was submitted upon the brief and also oral argument of Paul B. Lorenz of Cheyenne, Wyoming.

## OPINION

BLUME, Chief Justice.

This is an action brought by some fifty-five plaintiffs against five defendants to recover about $19,000 paid by the plaintiffs to the defendants and lost in a venture to discover oil. The defendants had some leasehold interests in Crook County, Wyoming, on which they wanted to drill an oil well. They did not have the money, or not sufficient money, for the drilling of the well and so they solicited the plaintiffs to raise sufficient money to pay the driller. The plaintiffs accordingly paid certain amounts of money to the defendants and a contract was entered into between them and the defendants which will be mentioned hereafter. The defendants had a contract with one Ralph Gardner to do the drilling: That contract provided, among other things, as follows: "Contractor shall drill the well herein provided for, through the Deadwood Sand or to a sand of commercial production if such is discovered at a lesser depth, or to granite or other practically impenetrable substance, which said granite is estimated at approximately 2200' below the surface.

If oil is not discovered and contractor reaches granite or other practically impenetrable substance, contractor's responsibility for the drilling of the well shall be at an end hereunder."

Paragraph 10 of the Gardner contract further provides:

"The parties of the second part agree to place in the Sundance Bank the sum of Fifteen Thousand Dollars ($15,000.00), to be used for the drilling of the said well, which said $15,000.00 shall be paid to the contractor as follows: $5,000.00 when the contractor has a drilling crew at the well site and he is ready to commence drilling; $5,000.00 when the driller has completed One Thousand (1,000) feet, and $5,000.00 upon discovery of oil in commercial production or when driller has drilled through the Deadwood Sand or to granite or other impenetrable substance resulting in a dry hole."

The driller used a rotary drill in drilling the well in question, which is a rig which has for many years been the ordinary rig used in drilling an oil well. He went down to the depth of about 1250 feet. Then the witness and defendant Kreiger received a telegram to come and see the well. He complied. He found that the drillers had struck a hard substance. He watched them work for a period of three days in attempting to go to a greater depth, but they were unable to do so. The drill "chattered", which seems to mean that a very hard substance had been struck. The drill stem was twisted off. A part of the rock that had been struck was brought to the surface, which the drillers stated was granite but to which the witness, who was not a geologist, was unable to give a definitely used geological name. The witness attempted to crush it with a hammer but it was difficult to do so. Thereafter Gard-

ner moved a cable tool outfit on the well evidently attempting to determine as to whether or not he would be able to penetrate the rock which had been struck. He went down to the depth of about 900 feet, his tools were lost, and the well was thereafter plugged and abandoned.

The contract with Ralph Gardner was dated February 1948 and the drilling was apparently done in the spring and summer of that year. About two years thereafter, namely on August 16, 1950, the plaintiffs served notice upon the defendants stating that in view of the fact that the defendants had not carried out their agreement with the plaintiffs, the latter considered the agreement rescinded and demanded the repayment of the sums of money which they had advanced to the defendants.

The plaintiffs commenced their action against the defendants on May 17, 1952. They alleged in their separate causes of action that they had entered into an agreement in the spring of 1948 with the defendants. Paragraph 2 of the causes of action of the plaintiffs Anderson and Pollare was as follows: "That in said agreement plaintiffs are designated as party of the second part and defendants are designated as parties of the first part; that said agreement provides, insofar as material to this action, that the parties of the first part held or were about to acquire oil leases covering property hereinafter referred to; that the said parties would have a bottom hole well drilled on the Southeast Quarter of the Northwest Quarter of Section 17, Township 49 North, Range 63 West of the 6th P. M., Crook County, Wyoming; that said parties of the first part would convey to said party of the second part an undivided percentage of overriding royalty in said well and an undivided percentage working interest in certain leased acreage described in said agreement; that

a copy of said agreement, except for names of parties and amounts, is hereto attached, marked plaintiffs' exhibit "A" and by reference made a part thereof."

They further alleged that the plaintiffs paid to the defendants a sum of money specified; that defendants caused the drilling to be begun but did not complete said well or drill a bottom hole well; that they went only to the depth of 1202 feet and then abandoned it, although to obtain a bottom hole well it would have been necessary to drill to a depth of approximately twice the depth of said well when it was plugged and abandoned; that defendants did not convey to the plaintiffs any royalty or interest in any acreage and defendants have placed it out of their power to perform by no longer having valid existing leases to any of said property; that plaintiffs have elected to treat said agreement as rescinded and not in effect, and have so notified the defendants; that defendants are now indebted to plaintiffs for the money previously had and received by the defendants from plaintiffs; that they have not paid that amount but have refused to do so and have continued to do so. Judgment for the amount so paid to the defendants was accordingly demanded. The allegations of the remaining plaintiffs are substantially the same.

Attached to the petition is the contract which was entered into between the plaintiffs and the defendants and is—leaving out minor matters—in words and figures to-wit:

## "AGREEMENT"

"Whereas, Ralph Gardner of Gillette, County of Campbell, Wyoming, and Allen A. Pearson of Cheyenne, County of Laramie, Wyoming, have agreed and covenanted in two contracts for assignment to assign to K. W. Bell, Anthony J. Sargeant, J. R. Holcomb,

Jacob Kreiger, and James P. Horiskey, hereinafter designated as parties of the first part, certain oil and gas leases; and

"Whereas, the said contracts provide for the assignment to the said parties of the first part that certain ten (10) acres contained in the following described forty (40) acres, to-wit:

"SE¼NW¼ Section 17 Twp. 49 N., R. 63 W., 6th P. M. on which the drilling rig of the said Ralph Gardnes is now located and on which a hole has been commenced; and

"Whereas, the parties of the first part also have a contract for the drilling of a bottom hole well with the said Ralph Gardner on the said ten (10) acres; and

"Whereas, the said contracts further provide for assignment to the said parties of the first part of additional leases on Three Thousand acres, (3,000), adjacent or near to the said discovery well site, which said contracts provide for the payment of 15% overriding royalty to the land owners and the assignors on all oil and gas produced, and said 3,000 acres being more particularly described as follows: to-wit: (Here the land is described)

"Whereas, the said assignments of leases are now held in escrow in the American National Bank of Cheyenne, Wyoming; and

"Whereas, it is the intention and desire of the parties of the first part to have the said discovery well drilled:

"Now, therefore, in consideration of the sum of $......................., the said first parties hereby agree to allocate to ..........................................................., hereinafter named party of the second part, a ......................... overriding royalty on all oil and gas produced by the dis-

covery well and an undivided .......................... working interest in the leases on the 3,000 acres hereinbefore described. It is agreed that the parties of the first part shall have complete and exclusive charge of the land and the operation thereof.

"Provided, however, that if the parties of the first part have not sufficient money in escrow in the American National Bank of Cheyenne, Wyoming, by the 15th day of March, 1948, to proceed under their contracts with Allen A. Pearson and Ralph Gardner, then all moneys paid by party of the second part shall be then returned by parties of the first part and this agreement shall be null and void."

The defendants filed an answer admitting that they entered into a contract with the plaintiffs as set forth in the petition and denied the remaining allegations generally. As a further defense they pleaded that they had sufficient money in escrow in the American National Bank to proceed with the contract with Gardner as they had agreed to do in the contract; that the defendants fully performed all the terms and conditions of the contract; that they have faithfully performed all the terms and conditions of their contract with Ralph Gardner, the drilling contractor; that the driller drilled to a depth of approximately 1250 feet, at which point further penetration became impossible; that no oil was produced from said well and further penetration being impossible, it became a "bottom hole" well in accordance with the terms of the contract between the defendants and Ralph Gardner; that since no oil was produced from the well, they were not required to allocate to the plaintiffs any royalty in oil and gas produced by the well; that the land owner cancelled the leases, and the working interest which the defendants had became of no value and inoperative and that any

allocation of any such working interest would be a futility.

The case was tried to the court without a jury. Judgment was entered in favor of the plaintiffs for the full amount, namely, for the amount of approximately $19,000 together with interest thereon, the judgment providing for the recovery of a separate amount for the several plaintiffs. From the judgment so entered, the defendants have appealed this case to this court.

1. Action at Law or in Equity—Rescission.

The plaintiffs in this case rescinded the contract between the parties. Many cases hold that rescission must be made promptly. 17 C.J.S. 913. That has its bearing herein as hereafter mentioned. If there was a substantial breach of the contract, the plaintiffs had the right to rescind it. 17 C.J.S. 906, 1 Black on Rescission and Cancellation, Sec. 196. Williston on Contracts, Rev. Ed. Vol 5, § 1455 states: "The right of rescission and restitution generally exists as an alternative remedy to an action for damages where there has been repudiation or a material breach of a contract, and is most commonly exercised when the aggrieved party has performed fully or in part, and wishes to recover what he has given or its value." In Section 1457 of the same work, it is stated: "If a party to a contract has paid money and the other party has wholly failed to perform on his part, restitution may be had both in England and in the United States."

Counsel for defendants say that the action before us is one in equity. Counsel for plaintiffs say it is an action at law. The point is probably not important in this state except when a jury is demanded. We stated in Urbach v. Urbach, 52 Wyo. 207, 224, 73 P. (2d)

953: "It may well be said that we have but one system of law, consisting of the common law, in so far as applicable, statute-law, and principles of equity. That is the objective field from which the court picks out those particular principles which are applicable in the particular case before it. The court reaches out into this broad field of law, and picks out the appropriate principles which fit the pleadings and the facts, whether such principles are found in one statute or another, or in the common law or among the rules of equity." In the case of Philpott v. Superior Court, 1 Cal. (2d) 512, 36 P. (2d) 635, 95 A.L.R. 990, 993, speaking on the same point, the court said: "In reality the distinction between the two classes of remedies is more or less arbitrary and groundless. It is well said also that the courts of equity are reaching into new fields of operation, and the courts of law are encroaching upon the former territory of the courts of equity." The courts having occasion to pass upon the point before us, have made a distinction between a rescission by the acts of the parties themselves, as in the case at bar, and a rescission asked of the court. It is stated in 12 C.J.S. 945, § 5, as follows: "The fact that the same word, 'rescission,' is used to designate both the equitable remedy of cancellation and the termination of a contract by the act of a party it has been productive of no little confusion. Unfortunately in some of the cases for rescission in equity language is used from which it might be inferred that precisely the same principles govern in suits in equity that are applied to determine the right of the party to sue at law. The remedy of rescission in equity must not, however, be confused with the rescission of a contract by a party thereto, as they are essentially different; in the latter case by his rescission or repudiation of the contract a party merely gives notice to the other party that he does not propose to be bound by the contract; whereas in the

former case a court of equity grants rescission or cancellation, its decree wipes out the instrument, and renders it as though it does not exist." A lengthy annotation on the subject is contained in an annotation to Philpott v. Superior Court, supra, 95 A.L.R. 1000 et seq. and it is said on page 1003; "Ordinarily an action to recover money on a contract which has been rescinded is peculiarly one within the jurisdiction of courts of law."

There was no contract between the parties promising that the money should be returned in case of rescission. If, however, it is unlawfully retained, the law implies that it should be returned. The remedy in such case is generally called an action for money had and received, (assumpsit) which is available, among other reasons, when a contract has been rescinded, and where the party rescinding has received nothing of value. 7 C.J.S. 115; 5 Corbin on Contracts 457; Philpott v. Superior Court, supra; Massey v. Becker, 90 Or. 461, 176 P. 425; Daly v. Bernstein, 6 N. M. 380, 28 P. 764; American Life Ins. Co. v. McAden, 109 Pa. 399, 1 A 256. Lord Mansfield in Moses v. Macfarlan, 2 Burr. 1005, 97 Eng. Reprint 676, 680, 681, said of this action as follows: "This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which ex aequo et bono, the defendant ought to refund * * * It lies for money paid by mistake; or upon a consideration which happens to fail; or for money got through imposition (express or implied) ; or extortion; or oppression; or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances. In one word the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of

natural justice and equity to refund the money." In 58 C.J.S. 906, § 1, speaking of this action, it is said: "The term 'money had and received' is the technical designation of a form of declaration in assumpsit, wherein plaintiff declares that defendant had and received certain money, etc. Although an action at law, an action for money had and received is equitable in its nature and is governed by equitable principles. It may, in general, be maintained whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other. Recovery in such case is based on a promise implied by law or quasi contract and on the equitable principle that one has been unjustly enriched at the expense of another is required to make restitution. The action presupposes something in the nature of a trust. * * * * No recovery may be had, however, unless it is against equity and good conscience for defendant to retain the money." In Philpott v. Superior Court, supra, p. 994, the court said: "In reality, it is an action in which the law, in order to prevent the unjust enrichment of defendants from the property of plaintiff, itself implies a promise to repay the sum demanded." The question before us accordingly is as to whether or not the defendants in this case have been unjustly enriched and should in justice and equity return the money which they received.

2. Restoring the Status Quo.

Except for the fact that a great deal of the arguments of counsel on both sides is devoted to the question of restoring the status quo of the parties, we should not have mentioned it. Counsel for the plaintiffs argues that his clients retained nothing and, accordingly, are not required to do anything in restoring the status quo. It is stated in 17 C.J.S. 923: "No offer of restoration is necessary where the rescinding party has

received nothing, or has received something which is utterly worthless." To the same effect see 3 Black on Rescission and Cancellation, 1495, § 617a. So far as plaintiffs restoring anything is concerned their counsel is undoubtedly right. But that does not help in solving any of the questions herein. Nor is that the claim of counsel for defendants. Indeed the use of language in terms of restoring the status quo is not perhaps too felicitous in connection with the contention of defendants. Their counsel in substance contend that defendants were expected to pay the money here involved to Gardner for the purpose of drilling an oil well; that they did so, and that it would be unjust and inequitable to require them to pay out the money twice— once to Gardner and again to plaintiffs. If the defendants paid out the money in good faith for the purpose intended—a matter again mentioned hereafter—then, of course, they were not in any manner enriched. And if, nevertheless, there was any unjust enrichment from a legal standpoint and defendants should be required to pay the money again to plaintiffs, that could in this case only be because of a substantial breach of the contract of the parties. That, in fact, is what plaintiffs claim. So we shall turn to the terms of the contract.

3.   The Contract of the Parties.

Defendants undertook not to pay out the money until they had sufficient on hand to pay the driller. No question is raised on that point. Defendants also undertook to convey royalty interest and an interest in leased lands if the well in question should prove to be a producing well. It did not prove to be such so that provision fell by the wayside, and was in fact waived when defendants rescinded the contract. We fully concur with counsel for defendants that the matters herein mentioned were the only matters and things which the defendants agreed to do so far as the specific terms of

the contract herein are concerned. Counsel for plaintiffs contend otherwise.

The contract sued on contains the provisions: "Whereas the parties of the first part also have a contract for the drilling of a bottom hole well with the said Ralph Gardner on the said ten acres." That is a recital or a representation on the part of the defendants that they had such a contract. If that had not been true, plaintiffs might, perhaps, have sued the defendants for misrepresentation or fraud. The dictionary does not define "bottom hole well" and we have not been cited to any authority which defines it. Barnett v. Kemerer, 179 Okl. 588, 66 P. (2d) 1053, mentions a "bottom hole contract", which the court says means "that, when the operator drills a well to a certain depth, the owners or persons for whom the well is drilled will pay a certain sum." That does not quite reach the matter before us. In case of a contract of that kind the strata of the earth are probably well known and the depth to be drilled is definitely specified. Since the burden to prove a breach of the contract was on plaintiffs, the burden to prove that the defendants did not have a contract for a bottom hole well, or for that matter that a bottom hole well was not drilled, was on the plaintiffs. And an opinion such as mentioned hereafter, would not be sufficient for such proof. For aught we know a bottom hole well might mean a well of a depth when water is struck, or when unintentionally and without negligence drilling tools are lost. In the absence of evidence or a specific contract to the contrary, it is not unreasonable to hold that when a well is drilled by a rotary drill—a drill ordinarily used by all drillers—and a practically impenetrable substance is reached, then a bottom hole well has been drilled. Hence no basis for fraud, that is to say misrepresentation, exists in this connection.

In fact no fraud is pleaded or claimed, so it was hardly necessary for us to mention this matter but we have done so merely for a fuller understanding of the contract before us.

Counsel for plaintiffs states in his brief: "It was the clearly expressed intent of all parties that defendants would drill such well to bottom hole * * * * the evidence is likewise indisputable that defendants did not drill such well." It was, of course, the intention that a bottom hole well should be drilled, but the statement that "defendants would drill" such well is simply not true and it is somewhat difficult for us to understand how counsel for plaintiffs, in view of the record before us, came to construe the contract in that manner. The written contract conclusively shows that the drilling was to be done by Ralph Gardner, who was an independent contractor, and not by the defendants. Hence the most that counsel could possibly claim is that the defendants guaranteed that the driller would drill a bottom hole well. It is common knowledge that many different matters may happen to prevent a driller from going down to a definite depth. Any man who knows anything at all, or heard anything at all, as to the incidences and hazards connected with the drilling of an oil well, would know how perilous it is to undertake to guarantee the exact performance of a contract on the part of the driller, or that he would go down to a certain depth, especially in territory not fully explored, as seems to be true here, and that fact—if there were any doubt as to what the defendants undertook to do—should weigh heavily in showing that the defendants did not undertake to guarantee the work of the driller. However, there is not, we think any doubt as to what the defendants undertook to do. There is not, so far as we can find, a single expression in the written contract to convey the thought that the defend-

ants themselves were to drill a bottom hole well or that, impliedly or otherwise, they guaranteed that Gardner would drill such a well. So far as the record shows, all the parties simply rested their hopes in the driller, and the benevolent smiles of fate that all would turn out well.

Oral testimony was introduced that the defendant Sargeant or Kreiger stated to some of the plaintiffs, when the latter asked as to what was meant by "bottom hole well", that it meant that the well would be drilled to oil or to granite. The defendant Sargeant testified that a bottom hole well meant granite or "just as far as you would go." That testimony seems to be corroborated to some extent, at least, by the witness Mulcare. Much of the contention of counsel for plaintiff seems to be based on these statements. So far as the record shows, there was no confidential relationship existing between the defendants and the plaintiffs when the money was being raised. They were dealing, apparently, at arms' length. It does not appear that defendants knew anything more about what was meant by bottom hole well than the plaintiffs. The statements, we think, were no more than opinions or trade talk and fraud cannot be predicated on matters of opinion. 37 C.J.S. 226. However, no fraud is pleaded and so that question is not involved in the case. Moreover the plaintiffs could have found out the exact terms of the Gardner contract had they taken any pains in making inquiry. See 37 C.J.S. 269. In any event, it is a far cry from the expression of an opinion to a guaranty that the well would be drilled to oil or granite. If it is true, as it well may be, that Sargeant and Kreiger thought that the driller would go down to granite, there was no guaranty on the part of the defendants that he would do so, and since no fraud is pleaded or claimed, the cause of action of plaintiffs herein is without support in the evidence.

We might say in passing that the witness Thomas, a geologist, testified that no granite would be found at the well in question short of about 2200 feet, although he admitted that it was possible that an upheaval at the place of the well could have taken place. The testimony is not, we think, important. Defendants did not undertake to guarantee that the well would be drilled to granite or to any other depth. Looking at the case from a broad, equitable standpoint, as we must, the facts present, it would seem, a case in the nature of a joint adventure to discover oil in which all the parties took a joint risk. They were disappointed as hundreds or perhaps thousands of the citizens of this state have been when they ventured into an almost gambling undertaking of finding oil. As far as the record shows the defendants are in no way to blame that the venture was not successful and no reason appears why they should be punished for a failure so common in exploring the hidden treasures of the earth. They were not enriched in so far as they paid out in good faith the money involved herein. They as well as plaintiffs lost. We can find no justification for making them the only losers.

4. Money Paid for Definite Purpose—Unjust Enrichment.

In view of what has been said, the case before us becomes rather simple. We think that it should be considered as one in which the money was raised from plaintiffs for a specific purpose namely, to pay Gardner on his contract for drilling an oil well. There can scarcely be any doubt that it was raised for that purpose. While the terms of the contract itself do not say anything about it, the law imposes a duty upon the defendants, namely to pay out the money raised in good faith for the purpose mentioned. In so far as that purpose was not fulfilled, the defendants should be held

liable herein. We think, speaking broadly, that a rule similar to that stated in 58 C.J.S., § 12, p. 922, applies herein namely, that: "Where one received money from another for a particular purpose and neglects or refuses to apply it to such purpose, it may be recovered in an action for money had and received." Defendants offered to prove that they paid Gardner according to contract. Counsel for plaintiffs objected to the offer of proof of payment on the ground that the contract with Gardner had not been pleaded in full, stating that it made no difference if defendants paid out ten times the amount they actually paid. The court sustained the objection. We think the objection to be too technical and overlooks the justice of the case. Counsel cite 13 C.J. 530-531 which states that reference to another contract is sufficient. That authority seems to be against plaintiffs rather than for them. The Gardner contract was introduced into the case by the pleading of the plaintiffs themselves and defendants pleaded that they had fulfilled that contract. The gist of the action for money had and received is as to whether or not the party receiving the money has been unjustly enriched. Assuming, though not deciding, that the burden of proof of showing that no unjust enrichment took place was under the circumstances herein on the defendants—a point of some doubt—the defendants were entitled to show that they had paid out the money which they received as contemplated by the parties, so we shall consider the offer of proof as received. The Gardner contract required the defendants to pay $5,000 when the former was ready to commence drilling; $5,000 more when he had drilled to a depth of 1,000 feet. These sums were evidently paid since the well was drilled to a greater depth. We can conceive of no possible reason why these sums should be recoverable by the plaintiffs. The only possible doubt could arise in connection with the remaining sum of $5,000, and

that the matter is not free from doubt may be conceded. But someone had to determine as to whether or not to pay Gardner, or whether to litigate or compromise the matter. For the period of about two years none of the plaintiffs made any objections whatever to the course taken by the defendants, although the testimony shows that at least some of the plaintiffs knew immediately after the well failed the exact situation with regard to the well drilled by Gardner, but they did nothing, though, had they been diligent in protecting their rights, they could have entered a protest against paying Gardner any further money. The matter of paying Gardner was, by the contract, and by the non-interference of the plaintiffs left to the defendants. So we think, taking all circumstances shown herein into consideration, and especially in view of the gambling-like nature of the transactions herein, that when it is not shown that the last $5,000 paid to Gardner—if in fact paid—was paid to him in bad faith by the defendants, the money should not be recoverable by plaintiffs. No bad faith on the part of the defendants has been shown. It appears herein, however, that plaintiffs paid to the defendants approximately the sum of $19,000 and it does not appear that the difference of about $4,000 has been paid out by the defendants for the purpose for which it was intended. We can find no justification for the retention of that amount and it should be returned to the plaintiffs in proper proportion. The justice of that statement is clearly seen if we should assume that $50,000 had been raised but only $15,000 had been distributed. Since an accounting is required no interest should be allowed.

The judgment of the trial court herein is accordingly reversed with direction to dismiss the present petition giving the plaintiffs, however, the privilege of filing an amended petition in the nature of an accounting to

recover the amount still in the hands of the defendants as above mentioned, including any amount which was not actually paid to Gardner.

RINER, J., and ILSLEY, J. concur.