**Pete SVALINA, Appellant (Plaintiff below),**

**v.**

**BIG HORN NATIONAL LIFE INSURANCE COMPANY, a Wyoming Corporation, Appellee (Defendant below).**

**No. 3814.**

Supreme Court of Wyoming.

April 2, 1970.

Bruce P. Badley, Sheridan, for appellant.

Claude W. Martin and William H. Brown of Brown, Drew, Apostolos, Barton & Massey, Casper, for appellee.

Before GRAY, C. J., and McINTYRE, PARKER and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Plaintiff filed complaint alleging that he, being elderly, foreign-born, and poorly educated, had upon representations of the defendant's salesmen in 1964 and 1965 writ-

ten two checks totaling $5,160.40 for capital stock in the company, having been assured that in addition life insurance would be carried on anyone plaintiff might designate; that defendant had failed to issue stock as promised and instead issued ten insurance policies on plaintiff's children. Accordingly, he asked judgment that the transaction be set aside and the amount of his checks returned because of the overreaching of the defendant and its agents. Defendant answered, denying both generally and specially, and alleging also that after telephone calls by plaintiff's children a conference was held between the parties on June 29, 1966, and it was agreed that no misrepresentations had been made by defendant or its agents and at plaintiff's request an arrangement was worked out whereby certain policies were terminated and certain others kept in force. After various interrogatories and denial of plaintiff's motion for summary judgment, pretrial order was entered, providing, inter alia, that defendant might file an amended answer and stating plaintiff's contentions that the complaint did not allege fraud but that there was misrepresentation by defendant through its agents and that there was a promise to sell stock in the defendant company, which was not delivered; that upon the acceptance of the checks defendant was unjustly enriched; and that plaintiff prayed for the return of the $5,160.40 paid. Defendant's amended answer set up the further defense of the statute of frauds (§ 34–8–319, W.S. 1957 (1969 Cum.Supp.)); that plaintiff had executed written applications for insurance with no other written agreement at such time and was estopped to impeach the terms of the applications or contend that any other or different arrangement was made between them; and further that he was entitled to no equitable relief because he had asserted no right during a period of time sufficiently long to use up and consume all the premiums paid upon the policies and was thereby guilty of laches and barred from relief.

■ After plaintiff had rested at the conclusion of his evidence, defendant moved for judgment on the ground that a prima facie case had not been made out, which motion was granted, and judgment was entered for defendant and against plaintiff on all issues. Plaintiff has appealed, contending that the insurance company was unjustly enriched because of Mr. Svalina's mistaken idea that he was to receive stock in the company, the rationale here being substantially similar to that expressed in the complaint, i. e., the agents of the company assured and promised that stock would be issued in addition to the insurance policies; plaintiff was an elderly person, foreign-born, without formal education; and the solicitations of the agents were overreaching and should be set aside. This, of course, relates to a claimed unilateral mistake of the plaintiff, brought about by the representations of defendant. Although we are presented with a number of references to A.L.I. Restatement, Restitution, we think the general law is sufficiently stated in an encyclopedic work, 17 C.J.S. Contracts § 143, to the effect that a mistake of only one of the parties to a contract in the expression of his agreement or as to the subject matter does not ordinarily afford ground for its avoidance or relief even in equity but that there is an exception to the rule where the mistake of one party is known by the other and particularly if it is caused by the other. Our court has discussed the question more definitively in Goodson v. Smith, 69 Wyo. 439, 243 P.2d 163, 244 P.2d 805, which, although it dealt with fraud and duress as well as mistake, separately examined each of these three grounds for setting aside a contract. We pointed out in Goodson, 243 P.2d at 170–171, that rescission or cancellation is a drastic interference with the provisions of a contract and that if the parties had deliberately put their engagement in writing it is presumed that the whole contract had been so reduced, but we continued:

"* * * a contract may be cancelled for fraud, duress or mistake, but the burden to prove these factors is upon the party asserting it. * * * '* * * when he seeks to impeach the instrument on the

ground that it does not contain the whole contract, or that it contains more than the contract, or that he was deceived or misled as to its purport or provisions, the burden of proof is upon him to establish these contentions * * *.' [3 Black, Rescission and Cancellation § 679 (2 ed.).] * * *"

Similarly, in Potucek v. Cordeleria Lourdes, 10 Cir., 310 F.2d 527, 532, Judge Breitenstein held:

"A mistake justifying rescission need not be mutual. The mistake of one party justifies affirmative relief when the fact as to which the mistake is made goes to the basis of the transaction, and was known to the other party to the transaction. * * *"

In Standard Accident Insurance Company v. Wilmans, E.D.Ark., 214 F.Supp. 53, 61, an insurance case, the court, alluding to the previously mentioned section of Corpus Juris Secundum and to Annot., 59 A.L.R. 809, said:

"It is settled that a court of equity will in certain circumstances grant rescission of a contract entered into as a result of a unilateral mistake of one of the parties, where that mistake has been produced by the conduct of the other party and where the parties can be put in status quo."

We pass then to the question of the proof which was before the court. It is elementary that the action taken by a trial court in directing a verdict must be viewed under the rule that the evidence offered by the plaintiff will be taken as true with all reasonable inferences and intendments to be drawn therefrom. Pangarova v. Nichols, Wyo., 419 P.2d 688, 690. The same rule is, of course, applicable to cases in which the court grants judgment for the defendant at the close of the plaintiff's case. Hawkey v. Williams, 72 Wyo. 20, 261 P.2d 48, 55.

Here an understanding of the evidence presented by plaintiff can best be had by a recitation of excerpts from the testimony although it might first be noted that it was at a County Fair in Gillette when plaintiff first engaged in conversation with defendant's agent regarding the possibility of investing in that company. Thereafter he was visited at his home by defendant's agents; and both he and his wife said they believed the checks issued to the company for $3,660.40 on August 26, 1964, and $1,500 on August 26, 1965, were for "stock" or "shares" in the company. Admittedly plaintiff signed applications for insurance on his five children and thereafter received policies on them,[1] but it was his position that it was understood the company itself was paying for the insurance. Mrs. Svalina said she had asked the agents "how they could do that" and was told "the company had a way."

The testimony of plaintiff and his wife is revealing:

### MR. SVALINA

"Q Back in 1964 did you hear about Big Horn National Life Insurance Company? A Well, they had a big program there in Gillette and everybody was taking their stuff to show * * * telling about what they raise on their place, like corn, and the different way. * * * Craver [defendant's agent], he had one [a booth], too. * * * He called me up there."

"Q What did he say to you? A Well, he said that there's a company here in Casper to make their own, buy their stock,

---

1. Two policies for Ellen L. Thompson, showing the date of issue as September 16, 1964, were received by the Svalinas November 19, 1964. On May 12, 1965, Mrs. Svalina wrote Big Horn National Life saying they had invested money in that company in 1964; that they would like some kind of receipt that they were stockholders; that their children were to have been insured but only policies for their daughter, Ellen Thompson, had been received. On May 13, 1965, two policies on Mary Ann Woods and two on Jack A. Svalina, showing the date of issue as September 16, 1964, were received. Two showing the date of issue as May 14, 1965, on Frank J. Svalina were received July 30, 1965; two on Thomas I. Svalina showing the date of issue as May 20, 1965, were received July 30, 1965.

you know * * *. * * * I asked him * * * '* * *. what are they paying in interest?' * * * he said, 'ten percent, maybe more. You get ten percent, anyway.' * * *"

"Q * * * Why did you give Mr. Craver this check * * * on August 26, '64? A. That's the first one?

"Q Yes. A Well, it was to get the interest on the money. It would be better than getting nothing. I couldn't get anything. I thought I could get this 10 percent interest or maybe less or more, but he said more than that."

"Q Mr. Svalina, after you gave Mr. Craver this first check for $3,660.40 * * what did you do? A Well, I didn't do nothing, just stayed there and let her— we thought we'd get interest on that. And he come up with another man one time, the next time; that's when they got that other check."

"Q And when the two men were there on the second meeting, did you give them a check for $1500? A Yes, sir, that's what they wanted. And I asked what was the interest on the other money. Well, he says, 'You've got a thousand dollars.' Well, I didn't see that one thousand dollars, but he told me one thousand dollars interest on that stock money."

"Q They had previously showed you at your house August, 1964, a policy of life insurance just like the ones you received, had they not, and explained its provisions to you? A No, they didn't. They didn't say nothing about the life insurance or not a thing.

"Q They said nothing about it? A That's right."

"Q My question is this: By the time that a year went past after you gave the first check, you had learned, had you not, that you had bought life insurance on your children? A No, I didn't know anything about it. I didn't think I made any insurance on the children. He didn't tell me until the last thing that I was making those notes."

"Q * * * you have testified that these two checks you thought you were getting an interest in the company of some sort, some stock, or some investment? A That's right.

"Q When you left Casper [after signing the June 29, 1966, letter] was that still your understanding? A The same thing."

### MRS. SVALINA

"Q Were you present when Exhibits 1 and 2 [the two checks totaling $5,160.40] were given to them [Mr. Craver and Mr. Pollock]? A Yes."

"Q What did the gentlemen say? * * Let's go to the first one now, on the first check No. 1? A Well, they come in, they said they weren't selling insurance, they were selling stocks or shares, we were making an investment, we would invest our money with the company."

"Q What was the [first] check given for? A Well, it was for investment, investing our money in stocks or shares.

"Q Were there any terms explained by Mr. Craver or Mr. Pollock about a share of the profits or anything like that? A Yes, there was.

"Q What did they say? A They said we'd get 10 percent or more interest on our money.

"Q And were you asked to make additional payments thereafter? A No, that was to be our only payment."

"Q Tell me, on the first meeting, when was the first time that insurance was mentioned, if at all, by Mr. Craver or Mr. Pollock? A Soon after they got in the house. They just said they weren't selling insurance."

"Q Did they use any terms at that first meeting with respect to your sharing in the profits of the company? A Yes, we were to share in the profits. We were to get a share, get dividends or money from the money we invested."

"Q In August of 1965, which was after you had received all ten of the policies, between the previous November and

July 30th, another contract was purchased at a cost of $1500, was it not? A We didn't purchase a contract. We thought we were still getting some shares that we were going to draw some interest on. We just paid them some more money and they just said they put that in for us to draw interest on, put it in with the original check to draw interest on."

█ What might have developed had defendant's motion for judgment been overruled cannot be surmised; but at the stage of the case when the motion was presented, the trial court had no alternative to the acceptance of the positive statements that the agents had said they were not selling insurance but were selling stocks or shares and that Mr. Svalina would receive at least 10 percent on his investment, which coupled with the testimony concerning the Svalinas' understanding and the reasons therefor, called for application of the earlier mentioned rule, which allows relief for a unilateral mistake.[2]

## DEFENDANT'S ARGUMENTS

█ Defendant advances a number of reasons why the appeal should fail. On two of these (that courts do not grant relief for unilateral mistakes and that in the absence of fraud or duress a person is bound by anything he signs) we have already expressed our views demonstrating that defendant misconceives the correct law in such aspects either in concept or application. We pass then to other points raised, first that the alleged contract for the purchase of stock would be unenforcible because of the absence of a writing signed by the company's representative as required by the statute of frauds. This on its face is self-defeating since plaintiff by his action did not seek to enforce the contract for stock; the statute of frauds has no application.

█ It is next urged that according to the evidence plaintiff had sufficient capacity to enter into a contract with appellee. The authorities mentioned by us show that a unilateral mistake of one party brought about by or even known by the other party to the contract is not necessarily dependent upon the mental competency, education, or general ability to understand of the person misled.

█ Defendant further insists that the doctrine of unjust enrichment has no application because plaintiff failed in his burden of proving unjust enrichment and that in fact the record is barren of any proof in that regard since the appellant purchased the policies of the insurance on the children, received the coverage, and the defendant incurred overhead and expenses in providing the protection. Defendant is perhaps overwilling to favorably interpret the cases it cites. Of course, as Mr. Justice Cardozo said in Atlantic Coast Line Railroad Co. v. Florida, 295 U.S. 301, 309, 55 S.Ct. 713, 79 L.Ed. 1451, "The claimant to prevail must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it"; but as we have already indicated, the uncontradicted evidence demonstrated prima facie an offense to equity. Concerning First National Bank at Cody v. Fay, 80 Wyo. 245, 341 P.2d 79, and Anderson v. Bell, 70 Wyo. 471, 251 P.2d 572, on which defendant relies as holding that plaintiff had the burden of showing there to have been

2. An interesting article on "specialty" policies is found in 62 Mich.L.Rev. 167, the authors observing at 204:
   " * * * The emphasis on investment and a high rate of return tends to mislead the purchaser into believing that he is acquiring primarily an investment rather than a life insurance policy. The market success of some life insurance stocks prepares the way for even more striking deceptions, and some sales presentations are so successful that they convince the purchaser that he is acquiring stock in the company." Peripheral attention also might be directed to a statute dealing with unfair methods of competition in the insurance business, § 26–157, W.S.1957 (repealed, Session Laws of Wyoming, 1967, c. 136, § 671), defining as a deceptive act the making of any statement misrepresenting the dividends to be received on a policy (now covered by § 26.1–245, W.S.1957, C.1967).

unjust enrichment, we call attention to Judge Blume's specific avoidance of the burden-of-proof question in the Anderson case, saying, 251 P.2d at 580, that it was "a point of some doubt." In the First National Bank case, 341 P.2d at 84, we held that the record was devoid of any substantial evidence showing a duty to repay. In short, we found lack of the support for the first requisite in a suit for restitution, i. e., a violation of equity and good conscience. Thus in the two mentioned Wyoming cases we did not reach the burden-of-proof question in unjust enrichment. On that aspect we note the rule announced in Sawyer v. Mid-Continent Petroleum Corporation, 10 Cir., 236 F.2d 518, 522, that the burden of proof in respect to any deductions from money to be restored because of mistake—there being no guilt on the part of the payee of fraud or deception—was on the one who had received the money. In Greene & Ladd v. Bernstein, 39 Misc.2d 1062, 242 N.Y.S.2d 367, 369, it was held that the burden of showing a detrimental change making repayment of money received by mistake inequitable was upon the person so contending. To a similar effect is Mutual Life Insurance Company of New York v. William B. Kessler, Inc., 25 Misc.2d 242, 202 N.Y.S.2d 92, 94; Hathaway v. Delaware County, 185 N.Y. 368, 78 N.E. 153, 154, 13 L.R.A.,N.S., 273. It follows that this phase of the insurance company's challenge to the appeal is misconceived and cannot prevail.

Finally, the company asserts that a compromise and settlement was effected by the parties as disclosed by the June 29, 1966, letter from Pete Svalina to the company:

"As per our conference in Casper of this date, we are terminating five of our contracts with your company and retaining five policies numbered 4549, 4551, 4553, 4555, and 4557. The total annual deposit hereafter will be in the amount of $1830.20. We desire to have a refund on the last two policies purchased (numbers 6910 and 6911), totaling $1500.00 and have this refund applied toward our 1966 premium. Also, we would like to apply against this premium endowments in the amount of $500.00 and 11% dividend in the amount of $201.32 leaving a credit balance of $371.12, which we would like to leave on deposit with the company to apply on our 1967 premiums.

"We now understand the insurance policies as explained to us this date."

Arguments and authorities cited on this point are without force unless we could accept counsel's semantics that the letter was in effect a compromise and settlement agreement, and we observe no characteristic of compromise and settlement therein.

## CONCLUSION

From what has been said, it follows that the uncontradicted evidence before the trial court, taken as true with all inferences and intendments reasonably to be drawn therefrom, disclosed a unilateral mistake by plaintiff, i. e., the contract with defendant was primarily for the purchase of its stock rather than solely for the purchase of insurance, which mistake was caused and known by defendant's agents. This evidence at that stage of the proceedings made out a prima facie case; and accordingly, the judgment of the trial court must be reversed and the cause remanded for proceedings consistent with the views herein expressed.

Reversed and remanded.