[Civ. No. 3511. Fifth Dist. Dec. 12, 1979.]

H. RUSSELL TAYLOR'S FIRE PREVENTION SERVICE, INC., Plaintiff and Appellant, v.
COCA COLA BOTTLING CORPORATION, Defendant and Appellant.

712

COUNSEL

Vizzard, Baker, Sullivan & McFarland and Jere N. Sullivan for Plaintiff and Appellant.

Robert D. Patterson, Jr., for Defendant and Appellant.

OPINION

**ZENOVICH, J.**—A complaint filed in Kern County Superior Court alleged that appellant Coca Cola Bottling Corporation (hereafter referred to as Coca Cola) was indebted to appellant H. Russell Taylor's Fire Prevention Service, Inc. (hereafter referred to as Taylor) in excess of $9,500. Taylor's complaint prayed for relief based on the following four causes of action: (1) account stated; (2) open book account; (3) indebitatus assumpsit; and (4) money had and received.

By stipulation of the parties, Taylor amended its complaint in the indebitatus assumpsit count, and Coca Cola amended its answer to assert as a separate affirmative defense the bar of the statute of limitations set forth in Code of Civil Procedure section 338, subdivision 3.

Thereafter, the court entered findings of fact and conclusions of law rendering judgment for Taylor in the sum of $7,157. From this judgment Coca Cola appeals. Taylor cross-appeals.

In this case, we must determine whether the limitations period in the California Uniform Commercial Code (hereafter referred to as Commercial Code) applies to sales contracts implied by operation of law.

In 1957, Coca Cola entered into an oral agreement with Taylor. Taylor was to periodically fill some of its own cylinders with carbon dioxide and supply them to Coca Cola's bottling plant in Bakersfield, California for use as fire extinguishers. The agreement specified that Taylor would furnish carbon dioxide at 16 cents per pound upon Coca Cola's request. Moreover, representatives of both parties agreed that Coca Cola would pay a $1 service charge for each tank filled in lieu of demurrage. Testimony at trial confirmed the fact that no demurrage was ever charged by Taylor for any outstanding cylinder.

Pursuant to the oral agreement, Taylor made deliveries of cylinders to Coca Cola's plant until September 23, 1971. The trial court found that September 23, 1971, was the termination date for Taylor's services. Within 90 days, employees of Taylor demanded return of several hundred cylinders in Coca Cola's possession. Coca Cola began to return many of the cylinders, although 246 in number were still missing at the time of trial.

As of January 31, 1972, Taylor's accounts receivable ledger for Coca Cola disclosed a zero balance. From June 1972 to July 1974, Taylor sent statements of demurrage charges to Coca Cola for $8,494.08. Coca Cola made no reply to these statements. Notwithstanding Coca Cola's silence, Taylor kept records and ledgers of the demurrage charges showing that Coca Cola owed $12,436.08 in late charges as of July 8, 1975.

The trial court found that Coca Cola's failure to return the cylinders was a taking and detaining of goods and chattels. In addition, the court determined that Taylor waived the conversion claim and elected to treat the action as a purchase and sale of the cylinders. Having determined that an implied-in-law sale occurred once the tort was waived, the court applied the four-year statute of limitations of Commercial Code section 2725, subdivision (1), and held the suit timely filed. Moreover, the court also made findings which supported its conclusion that Taylor was not entitled to recover on account stated or open book account theories.[1]

## The Coca Cola Appeal

Coca Cola contends that the trial court erroneously determined that Taylor's third cause of action—indebitatus assumpsit—was governed by the four-year statute of limitations provided in Commercial Code section 2725, subdivision (1).

The trial court determined that Taylor was not entitled to judgment upon the first and second causes of action, a ruling from which Taylor cross-appeals. In addition, Taylor apparently decided, as a matter of trial tactics, to abandon the fourth cause of action for lack of supporting evidence. Thus, the trial court had to rely upon the third cause of action (indebitatus assumpsit) in rendering its judgment.

---

[1]Since this case involves an issue of first impression, the full text of paragraphs from the judgment pertinent to the respective appeals are included in appendix A.

Procedurally, Taylor filed its complaint on June 4, 1975, more than three years after September 23, 1971, the date upon which demand was made for the outstanding cylinders. The trial court found that the suit was timely filed within the four-year statute of limitations set forth in Commercial Code section 2725, subdivision (1),[2] since the indebitatus assumpsit theory legally transformed the tortious conversion of the cylinders into a *fictional* contract of sale. Coca Cola contends that the trial court erroneously applied the four-year limitations period even though the gravamen of Taylor's claim was for "taking, detaining, or injuring any goods, or chattels," a cause of action governed by the three-year limitations period provided in Code of Civil Procedure section 338, subdivision 3. Under Coca Cola's construction of the action brought by Taylor, the suit would be time barred if the limitations period of the Commercial Code is deemed inapplicable.

In ruling upon the applicability of a statute of limitations, it has been recognized that courts will look to the nature of the rights sued upon rather than to the form of action or to the relief demanded. Neither the caption, form, nor prayer of·the complaint will conclusively determine the nature of the liability from which the cause of action flows. Instead, the true nature of the action will be ascertained from the basic facts *a posteriori.* (See *Day* v. *Greene* (1963) 59 Cal.2d 404, 411 [29 Cal.Rptr. 785, 380 P.2d 385, 94 A.L.R.2d 802]; *People* v. *Union Oil Co.* (1957) 48 Cal.2d 476, 482 [310 P.2d 409]; *Agair Inc.* v. *Shaeffer* (1965) 232 Cal.App.2d 513, 516 [42 Cal.Rptr. 883].) Since the trial court found the four-year limitations period governing sales contracts applicable, it must be determined whether indebitatus assumpsit—Taylor's cause of action—is based on contract or tort. In order to pinpoint the proper nature of the rights sued upon, an examination of the theory underlying indebitatus assumpsit is appropriate.

The general contours of the assumpsit cause of action have been summarized by Professor Corbin as follows: "The common counts in assumpsit are merely abbreviated and stereotyped statements that the

---

[2]Although the trial court did not expressly state reliance on Commercial Code section 2725, subdivision (1), its finding that the transaction was a "purchase and sale of said cylinders to Defendants [Coca Cola] by Plaintiffs [Taylor]" implicitly applies the four-year period mentioned in the Commercial Code.

Section 2725, subdivision (1), provides: "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it."

defendant is indebted to the plaintiff for a variety of commonly recurring reasons, such as...goods sold and delivered. They are allegations of indebtedness, and the action may be properly described as indebitatus assumpsit....The common counts could be used for the enforcement of express promises if they were such as to create a money debt, *as well as for the enforcement of implied promises and quasi contracts.*" (1 Corbin, Contracts (1st ed. 1963) § 20, p. 51, italics added.)

In *Philpott* v. *Superior Court* (1934) 1 Cal.2d 512 [36 P.2d 635, 95 A.L.R. 990] (criticized on other grounds in *Runyan* v. *Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 312 [85 Cal.Rptr. 138, 466 P.2d 682, 41 A.L.R.3d 1422]), the California Supreme Court discussed the historical evolution of indebitatus assumpsit. The court stated: "The action of *assumpsit,* in its development, had an interesting but stormy career at the common law. Although in existence for some years previous to that time, it came into prominence following the decision in Slade's Case in 1603 (Coke's Rep., vol. 2, p. 505; 2 Harvard Law Review, p. 16). It gradually gained prominence and widened in scope until 1760 when Lord Mansfield, in the case of *Moses* v. *Macfarlan* (2 Burr. 1005, English Reports, Full Reprint, King's Bench Book 26, vol. 97, p. 676), described its function as follows: 'This kind of equitable action to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, *ex aequo et bono,* the defendant ought to refund; it does not lie for money paid by the plaintiff, which is claimed of him as payable in point of honor and honesty, although it could not have been recovered from him by any course of law; as in payment of a debt barred by the statute of limitations, or contracted during his infancy, or to the extent of principal and legal interest upon a usurious contract, or, for money fairly lost at play: because in all these cases, the defendant may retain it with a safe conscience, though by positive law he was barred from recovering. But it lies for money paid by mistake; or upon a consideration which happens to fail; or for money got through imposition (express or implied); or extortion; or oppression; or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances. In one word the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.'

"Quoting the above, Mr. Holdsworth in his work on the History of English Law, volume 8, page 97, uses this language: 'It was thus in the

action of *indebitatus assumpsit* that the larger part of our modern law of *quasi*-contract has originated.'

" . . . . . . . . . . . . . . . .

"Authorities in support of the prevalent use of this form of action in the courts of the common law could be multiplied indefinitely, but we will close this branch of the discussion by a quotation from Professor Ames in volume 2 of the Harvard Law Review, page 69: 'The main outlines of the history of *assumpsit* have now been indicated. In its origin an action of tort, it was soon transformed into an action of contract, becoming afterwards a remedy where there was neither tort nor contract. Based at first only upon an express promise, it was afterwards supported upon an implied promise, and even upon a fictitious promise. Introduced as a special manifestation of the action on the case, it soon acquired the dignity of a distinct form of action, which superseded Debt, became concurrent with Account, with Case upon a bailment, a warranty, and bills of exchange, and competed with Equity in the case of essentially equitable *quasi*-contracts growing out of the principle of unjust enrichment. Surely it would be hard to find a better illustration of the flexibility and power of self-development of the Common Law.'" (*Philpott v. Superior Court, supra,* 1 Cal.2d at pp. 518-519, 520-521.) Although recognizing that a tortious act frequently formed the basis for invoking assumpsit, the court determined that "'its contractual quality was always its most distinct feature.'" (*Philpott, supra,* at p. 526, quoting 7 Holdsworth, History of English Law, p. 441.)

█ In the instant case, the trial court found that Coca Cola's failure to return the cylinders was conversion. Nonetheless, the court ruled that Taylor had waived the tort after making its demand for return of the chattels and *elected to treat the transaction as a sale of the cylinders.* This ruling appears to comport with California law, which allows a bailor in Taylor's position to treat the conversion as a *fictional* or *implied by law* contract of sale. (See *Chapman v. State* (1894) 104 Cal. 690, 695 [38 P. 457]; *Lehmann v. Schmidt* (1890) 87 Cal. 15, 20 [25 P. 161]; *Glantz v. Freedman* (1929) 100 Cal.App. 611, 614 [280 P. 704]; 7 Cal.Jur.3d, Assumpsit, §§ 11-12 (1979 pocket pt.) pp. 20-22.)[3] █ Generally, where there is a waiver of tort and suit in as-

---

[3]One treatise summarized the assumpsit cause of action as follows: "[V]iolation by a bailee of his duty to exercise appropriate care for the preservation and safety of property entrusted to him may be regarded either as a tort or as a breach of an implied condition of his contract. Of course, where the bailee's acts amount to a conversion, the

sumpsit, the statute of limitations relating to actions of assumpsit rather than tort applies, although the determination of what limitation period is appropriate may depend on the substance of the action and the nature of the right violated rather than the form of action. (7 Cal.Jur.3d, Assumpsit, § 34, (1979 pocket pt.) p. 48.)

As *Philpott* and other authorities suggest, the nature of rights inherent in the indebitatus assumpsit cause of action appear to be based in *contract* principles. This reasoning is further bolstered by the realization that Taylor had to waive *tort* remedies in order to avail itself of the assumpsit theory. It has been recognized that when a party entitled to enforce two remedies either institutes an action upon one of such remedies or performs any act in pursuit of such remedy, he will be held to have made an election of such remedy and will not be entitled to pursue any other remedy for the enforcement of his right. (*Acme Paper Co.* v. *Goffstein* (1954) 125 Cal.App.2d 175, 178 [270 P.2d 505]; *De Laval Pac. Co.* v. *United C. & D., Co.* (1924) 65 Cal.App. 584, 586 [224 P. 766].) ■ Given the binding nature of the election made by proceeding under indebitatus assumpsit, we are of the opinion that the trial court correctly found that the gravamen of Taylor's claims was contractual in nature.

After determining that the nature of the rights was based in contract, the trial court applied the four-year statute of limitations governing *sales* contracts in Commercial Code section 2725, subdivision (1). Because Taylor's assumpsit claim created a fictional sale, the novel question presented in this case is whether the limitations period in the Commercial Code applies to sales contracts *implied by operation of law*. If this section is inapposite to implied-in-law contracts, Taylor's

---

plaintiff may waive the tort and sue for the value of the converted property on the basis of goods sold and delivered, in which case his action is on a contract implied by law arising upon a waiver of tort.

"The rule allowing the plaintiff to waive a tort and sue in assumpsit applies to cases involving conversion of personal property. The right of the owner to waive the tort and sue in assumpsit is not limited, as in some jurisdictions, to those cases where the wrongdoer has sold the property or otherwise converted it into money and recovery of the proceeds is sought. The owner may sue for the value of the property converted by proceeding in assumpsit as for goods sold and delivered. The basis of recovery is that he consents to the taking of his property and affirms the act of the wrongdoer. He treats it as a sale, and may recover the value due him as under a contract of sale." (7 Cal. Jur.3d, Assumpsit, §§ 11-12 (1979 pocket pt.) pp. 21-22, fns. omitted.)

claim would be barred under the more restrictive time period of Code of Civil Procedure section 339, subdivision 1.[4]

Only one reported decision appears to address whether Commercial Code section 2725 encompasses implied-in-law sales contracts. In *Al Bryant, Inc.* v. *Hyman* (Pa.Ct.Comm.Pl. 1975) 17 U. Com. Code Rep. Service 790, a Pennsylvania lower court was confronted by a seller basing his suit upon a pleaded express oral contract and also suing in quasi-contract for the reasonable value of services provided. In deciding that the Commercial Code statute of limitations did not apply to a quasi-contractual cause of action, the court reasoned: "We find no cases on this question in any jurisdiction. However, the statute [Com. Code, § 2725] seems to apply only to actual contracts by its own terms: 'An action for breach of any contract for sale must be commenced within four years...' [citation]. The word 'contract' is defined in [Com. Code] § 1-201 to mean 'the total legal obligation which results from the parties' *agreement*.' [Original italics.] A quasi-contract does not arise from an agreement, *but by operation of law.* [Citations.] *It would appear that the writers of the UCC intended the four year limitations period to cover only express and implied contracts.*" (17 U. Com. Code Rep. Service at p. 793, italics added.)

Thus, *Bryant* found that the statute of limitations applied to *express* and *implied-in-fact* contracts, but not to *implied-in-law* contracts. We are not persuaded.[5]

---

[4]Code of Civil Procedure section 339, subdivision 1, provides: "[The periods prescribed for the commencement of actions other than for the recovery of real property, are as follows:]

"Within two years: 1. An action upon a contract, obligation or liability not founded upon an instrument of writing,..."

[5]*Bryant*'s reasoning is not helpful in the case at bar due to its reliance on Pennsylvania contract law. Although partially basing its determination upon a construction of the Commercial Code, the court also noted: "It has been held in Saltzman v. Saltzman, 189 F Supp 36 (1960), that the statutory limitations period of six years (12 PS § 31) which applies to contracts does not apply to actions in quasi-contract. If the six year general limit does not apply to unjust enrichment, *perhaps by analogy* the UCC four year limit does not so apply either." (*Al Bryant, Inc.* v. *Hyman, supra,* 17 U. Com. Code Rep. Service at p. 793, italics added.) Under California law, the *Saltzman* rationale is inapposite because the Legislature has provided a separate limitations period covering contracts "not founded upon an instrument of writing" (such as unjust enrichment) in Code of Civil Procedure section 339, subdivision 1. Since *Bryant* relied by analogy to legal principles inapplicable to situations in our jurisdiction, its interpretation should not be regarded as dispositive on the issue of extending the four-year limitation provision to implied-in-law sales contracts.

Taylor cites *Hachten v. Stewart* (1974) 42 Cal.App.3d Supp. 1 [116 Cal.Rptr. 631] as authority for the proposition that Commercial Code section 2725 has been extended to implied-in-law contracts in California.

*Hachten* involved an assignee of Mobil Oil who sought recovery of money based upon a *common count* "'for goods, wares, and merchandise furnished to defendants at defendants' request, [for] which...defendants agreed to pay.'" (*Hachten v. Stewart, supra,* 42 Cal.App.3d Supp. at p. 2.) The trial court granted summary judgment for defendant on the ground that Code of Civil Procedure section 339, subdivision 1, barred an action upon a nonwritten contract not filed within two years. The appellate court in *Hachten* reversed, holding that "actions on sales contracts may...be commenced within four years of accrual of the cause of the action, *even if the sales contract is oral.*" (*Id.,* at p. 3, italics added.) In holding that the plaintiff assignee was entitled to invoke Commercial Code section 2725, the court reasoned that this action was essentially one for price due the seller under section 2709, bringing the suit within article II of the code. (*Id.,* at pp. 2-3.)

In order to determine whether *fictional* sales contracts are governed by the four-year period, it is pertinent to construe the language contained in the Commercial Code's limitation statute.[6]

Commercial Code section 2725 deals with "contract[s] for sale" and, in definitional cross-references at the end of the section, makes refer-

---

[6]A decision of the Pennsylvania Supreme Court would initially appear to resolve which limitations period is pertinent to the instant case. In *Gardiner v. Philadelphia Gas Works* (1964) 413 Pa. 415 [197 A.2d 612], the court applied the four-year statute of limitations contained in Commercial Code section 2-725, rather than Pennsylvania's two-year limitations period for personal injury claims sounding in negligence, to an assumpsit action by customers against a gas company for injuries allegedly caused by breach of the company's implied warranty to transmit gas to customers in a safe manner. (*Gardiner, supra,* at p. 614.) There are two reasons why *Gardiner* should not be determinative in the present context. First, California has adopted an approach in conflict with *Gardiner,* holding that personal injury actions based upon a breach of warranty are governed by the one-year limitations period set forth in Code of Civil Procedure section 340, subdivision 3, rather than the statute of limitations prescribed by Commercial Code section 2725. (*Becker v. Volkswagen of America, Inc.* (1975) 52 Cal.App.3d 794, 802 [125 Cal.Rptr. 326].) Second, having once decided that *Philpott, supra,* 1 Cal.2d 512, established indebitatus assumpsit as a quasi-contractual (rather than tort-based) cause of action, the issue centers upon a contention not considered in *Gardiner*—namely, whether to apply the limitations period for contracts not founded upon a written instrument (Code Civ. Proc., § 339, subd. 1) or the statute of limitations for contracts of sale (Com. Code, § 2725, subd. (1)).

ence to Commercial Code section 2106. Commercial Code section 2106 defines "contract for sale" as including "both a present sale of goods and a contract to sell goods at a future time." In addition, the section defines "present sale" as "a sale which is accomplished by the making of the contract." Since "contract" is a key word in Commercial Code section 2106, illumination is provided by consulting Commercial Code section 1201, subdivision (11). This latter provision states that "'Contract' means the total legal obligation which results from the parties' agreement...." Further clarity is provided by Commercial Code section 1201, subdivision (3), which defines "Agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this code...."

Focusing upon Commercial Code section 1201, subdivision (3), it is important to note that the drafters of the Commercial Code defined agreement to mean *"the bargain of the parties...by implication from other circumstances including...."* The deliberate insertion of the word "including" denotes that the drafters contemplated agreements which could be implied other than in fact. This is further supported by Commercial Code section 1102, which states that the code should be liberally construed. (Com. Code, § 1102.) Given the fact that indebitatus assumpsit is a well-established contractual theory, there is ample reason for allowing Taylor to employ the limitations period for sales contracts contained in Commercial Code section 2725.

Three other reasons also support the conclusion that Commercial Code section 2725 encompasses implied-in-law sales contracts. First, we are of the opinion the literal meaning of the statutory language in Commercial Code section 2725 applies to fictional sales agreements. Commercial Code section 2725 states that the four-year period governs "An action for breach of *any* contract for sale...." (Italics added.) In construing statutes, it is established that courts are to give effect to statutes according to the usual, ordinary import of the language employed in framing them. (See *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; *Killian* v. *City and County of San Francisco* (1978) 77 Cal.App.3d 1, 7-8 [143 Cal.Rptr. 430].) In light of the plain meaning of "any contract," it is

reasonable to include implied-in-law agreements within the provisions of Commercial Code section 2725.[7]

Second, a broad reading of *Hachten* (see discussion of this case, *ante*) supports the proposition that Commercial Code section 2725 governs implied-in-law sales contracts. The court in *Hachten* stated that a complaint based on a common count "'for goods, wares, and merchandise furnished to defendants...'" was, in actuality, an action for price due the seller under Commercial Code section 2709. Having determined that the action fell within the Commercial Code, the court then concluded that Commercial Code section 2725 was applicable. (*Hachten v. Stewart, supra,* 42 Cal.App.3d Supp. at pp. 2-3.) Since indebitatus assumpsit is a common count, we are of the opinion that it is an action for "price due the seller" and thereby cognizable under the Commercial Code.

Third, this result is also sanctioned by the recommendation of the Advisory Committee to the Senate on the editorial aspects of the Uniform Commercial Code, which was transmitted to the California Senate Interim Committee on Judiciary prior to legislative enactment of Commercial Code section 2725 in 1967. In its report, the Advisory Committee stated: "The section deals with the Statute of Limitations with respect to contracts of sale and was promulgated to eliminate jurisdictional variations and provide relief for concerns doing business on a nation-wide scale." (1 Sen. J. (1967 Reg. Sess.) p. 1237.) The Legislature apparently responded to the need for consistent treatment of sales transactions when passing this provision, since it had deliberately omitted Commercial Code section 2725 in 1963 because the California State Bar Committee felt that "'there is no great need for such uniformity in statutes of limitation, [and] that such statutes may be governed by local policy with little hindrance to commerce among the states,...'" (See Cal. code com. to Cal. U. Com. Code, § 2725, 23A West's Ann. Com. Code (1964 ed.) p. 693.) Since application of a four-year limitations period to *fictional* sales contracts would promote business certainty and uniformity, our construction is buttressed by legislative concerns underlying the enactment of Commercial Code section 2725.

---

[7]Commercial Code section 1103 provides: "Unless displaced by the particular provisions of this code, the principles of law and equity...shall supplement its provisions." Since indebitatus assumpsit is a principle firmly established in contract law, it can be properly incorporated into the provisions of Commercial Code section 2725.

■ We therefore find that the trial court did not commit error in determining that the four-year limitation period of Commercial Code section 2725 applied to Taylor's claim. Taylor was not barred from pursuing Coca Cola through the assumpsit cause of action.

Coca Cola now contends that there was insufficient evidence to support the finding of the trial court that Taylor demanded return of the outstanding cylinders from Coca Cola within 90 days after the parties terminated their business dealings. We disagree.

The trial court found that Taylor had demanded return of the outstanding cylinders on September 23, 1971, from Coca Cola following termination of their business relationship. Coca Cola suggests that the lower court erred in making this factual finding on the theory that Taylor had demanded return before September 23, 1971, which would bar recovery of most cylinders under tort principles governing conversion actions.

■ It has been established that where an original taking is wrongful, the bar of the statute of limitations runs from the time of the unlawful taking. Moreover, where the original taking is lawful, the statute is not set in motion until the return of the property has been demanded and refused or until a repudiation of the owner's title is unequivocally brought to his attention. These principles are especially applicable in a bailment situation. (*Bufano* v. *City & County of San Francisco* (1965) 233 Cal.App.2d 61, 70 [43 Cal.Rptr. 223]; *Niiya* v. *Goto* (1960) 181 Cal.App.2d 682, 688 [5 Cal.Rptr. 642].) Since the parties were in a bailment situation, Coca Cola specifically argues that Taylor's actions in notifying Coca Cola of missing cylinders for purposes of making inventory checks was a "demand." Accordingly, it is Coca Cola's contention that the underlying tort of conversion was barred for most cylinders "demanded" before September 23, 1971.[8]

■ On appeal from a judgment in a civil proceeding, when two or more reasonable inferences can be drawn from the facts, the reviewing court is without power to substitute its deductions for those of the trier of fact. Even though contrary inferences could reasonably have been drawn, the reviewing court cannot make contrary findings where the trial court judgment is supported by substantial proof. (*Davis* v. *Local*

---

[8]Coca Cola apparently suggests that since indebitatus assumpsit initially involves waiver of the tort action, the prior "demands" cut off the conversion claim which, in turn, precluded the assumpsit cause of action.

*Union No. 11, Internat. etc. of Elec. Workers* (1971) 16 Cal.App.3d 686, 693-694 [94 Cal.Rptr. 562]; see also *Associated Creditors' Agency* v. *Davis* (1975) 13 Cal.3d 374, 383 [118 Cal.Rptr. 772, 530 P.2d 1084]; *Ellison* v. *Ventura Port District* (1978) 80 Cal.App.3d 574, 581 [145 Cal.Rptr. 665]; *Hicks* v. *Clayton* (1977) 67 Cal.App.3d 251, 261 [136 Cal.Rptr. 512]; *In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 745 [129 Cal.Rptr. 566].) Substantial evidence means evidence which is of ponderable legal significance—evidence that is reasonable in nature, credible and of solid value. (*Hall* v. *Department of Adoptions* (1975) 47 Cal.App.3d 898, 906 [121 Cal.Rptr. 223]; *Willburn* v. *Wixson* (1974) 37 Cal.App.3d 730, 737 [112 Cal.Rptr. 620].)

The record reveals that representatives of Taylor had asked Coca Cola to return the missing cylinders after September 23, 1971. Although the prior communications between the parties could have been interpreted as "demands," the trial court found that Taylor did so in 1971. In light of the deference which must be paid to the lower court's inferences, we find that there is substantial evidence to support its finding.

### THE TAYLOR APPEAL

In its conclusions of law, the trial court found that Taylor was not entitled to judgment based on its first cause of action, account stated. This conclusion was based on the court's factual finding that no fixed or readily calculable sum ever became due from Coca Cola to Taylor, since Coca Cola never agreed to pay a demurrage charge. Taylor contends that this finding was erroneous. We disagree.

Taylor more particularly contends that evidence revealed that Taylor's representatives sent a statement of demurrage charges to Coca Cola on several occasions, with Coca Cola failing to object or respond to such correspondence. It is Taylor's contention that this was an acquiescence to such charges.

■ To constitute an account stated, it must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay to the creditor the amount thus determined to be owing. In addition, the amount agreed upon must be either specifi-

cally stated or readily calculable. (1 Cal.Jur.3d, Accounts and Accounting, § 33, p. 255.)

One of the essential elements of an account stated is that a statement of indebtedness must exist between the parties. (See *Hemenover v. Lynip* (1930) 107 Cal.App. 356, 362-363 [290 P. 1089].) The trial court found that this statement did not exist because Coca Cola agreed to pay $1 per refill in lieu of demurrage. We are of the opinion that this finding is amply supported through testimony offered by both parties.

■ Furthermore, Taylor's pleadings preclude an assertion of an account stated. Taylor pleaded an account stated "in excess" of $32,013.25. It is elementary law that a claim must be reduced to a *definite* amount by agreement between the parties before it can form a legitimate portion of an account stated. (See *California Milling Corp. v. White* (1964) 229 Cal.App.2d 469, 478 [40 Cal.Rptr. 301]; 1 Cal. Jur.3d, Accounts and Accounting, § 33, pp. 255-256.) Thus, we find the trial court's determination that there was no fixed or readily calculable sum proven is supported by the record.

Finally, the argument that Coca Cola acquiesced to the statements submitted is without merit. The court in *Hemenover v. Lynip, supra,* 107 Cal.App. at page 363 stated: "[I]t was never intended that through the mere means of sending out a claim that thereby a legal and recoverable demand might be created unless the adverse party made prompt and effectual denial. The law was intended to preserve and protect legitimate demands *but not to create obligations independent of prior indebtedness.*" (Italics added.)

We therefore are of the opinion that the trial court correctly found that Taylor was precluded from judgment on the claim based upon account stated.

The trial court then concluded that Taylor was not entitled to judgment on the second cause of action because the demurrage charges kept in its account books did not constitute an open book account. This was predicated on the factual findings that the subsequent entries for indebtedness on Taylor's books were demurrage charges which were precluded by the agreement to pay $1 for refills in lieu of rental. Taylor contends that the trial court erred in making these determinations. We disagree.

 A book account is created by the agreement or conduct of the parties in a commercial transaction. Nonetheless, the mere recording in a book of transactions or the incidental keeping of accounts under an express contract does not of itself create a book account. Parties to a written or oral contract may, however, provide that monies due under such contract shall be the subject of an account between them. (*Warda v. Schmidt* (1956) 146 Cal.App.2d 234, 237 [303 P.2d 762].)

 Although Taylor contends that a book account of demurrage charges existed after September 23, 1971, the trial court found otherwise on the basis of the oral agreement to pay for refills pro rata. In examining sufficiency of evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of a finding as made, adopting all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. (*Jacoby v. Feldman* (1978) 81 Cal.App.3d 432, 442 [146 Cal.Rptr. 334], quoting *Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) In light of the refill-in-lieu-of-demurrage agreement, the lower court could reasonably have found that the subsequent record keeping was merely incidental, rather than an open book account.

We therefore find that there was sufficient evidence supporting the trial court's conclusion that Taylor was barred from seeking relief on the basis of an open book account.

The judgment of the trial court in the Coca Cola appeal is affirmed; the judgment of the trial court in the Taylor cross-appeal is affirmed, and the cross-appeal is dismissed.

Hopper, Acting P. J., and Fretz, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.

## APPENDIX A

FINDINGS OF FACT state in pertinent part:

"7. It is true: That the failure of Defendants to return cylinders delivered to Defendants by Plaintiffs constituted a taking and/or detaining of goods and chattels; that Plaintiffs elected to waive the refusal of the Defendants to return the cylinders after demand therefor as a tort and has elected to consider said refusal as a purchase and sale of said cylinders to Defendants by Plaintiffs; that said purchase and sale occurred when the Defendants ceased doing business with Plaintiffs as of September 23, 1971; that said cylinders should have been returned as of September 23, 1971 by Defendants to Plaintiffs; that interest has accrued since said date of September 23, 1971, as provided by law.

"8. It is true: That Plaintiffs' complaint was filed within four (4) years of the termination of the business relationship of the parties as of September 23, 1971.

"9. It is not true: That Section 339, Subdivision 1 of the Code of Civil Procedure is applicable to this action; that Section 337, Subdivision 2 of the Code of Civil Procedure is applicable to this action; that Section 338, Subdivision 3 of the Code of Civil Procedure is applicable to this action.

"10. It is true: That no specific or fixed amount due from Defendant to Plaintiff was ever agreed upon between the parties orally, in writing, or by acquiescence. No fixed or readily calculable sum ever became due from Defendant to Plaintiff in such manner as to constitute an account stated. No balance of accounts were struck between the parties. Defendant was never at any time indebted to plaintiff for demurrage, the one dollar per refill charge being in lieu thereof.

"11. It is true: That Plaintiff's last transaction involving delivery of cylinders to Defendant occurred on September 23, 1971. Plaintiff's books of account discloses [sic] zero balance due from Defendant to Plaintiff as to all transactions between them as of January 31, 1972. All subsequent entries in Plaintiff's books of account are for rental/demurrage. By the agreement of the parties, Defendant was not indebted to Plaintiff for rental or demurrage. Plaintiff's books, ledgers and records do not disclose any indebtedness from Defendant to Plaintiff on a book account."

CONCLUSIONS OF LAW state in pertinent part:

"1. That Plaintiff is not entitled to a Judgment on the First Cause of Action on an account stated because Defendant's silence did not amount to an agreement to the accounts rendered to Defendant by Plaintiff. No account was stated between the parties. No sums certain was [sic] agreed upon, either orally, in writing or by acquiescence.

"2. That Plaintiff is not entitled to a Judgment on the Second Cause of Action because the charging of demurrage by Plaintiff in its books of account did not constitute an open book account. Plaintiff is not entitled to recover from Defendant on the theory of a book account.

"3. Plaintiff is entitled to a Judgment on the Third Cause of Action for seven thousand one hundred fifty-seven dollars ($7,157.00), together with interest thereon from September 23, 1971 at 7% per annum."