Filed 6/5/15  Gordon & Rees v. Lopez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GORDON & REES LLP,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEVEN A. LOPEZ,<br><br>    Defendant and Appellant. | A140651<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-12-517080) |

Gordon & Rees LLP (Gordon & Rees) sued Steven A. Lopez for unpaid legal fees. The trial court granted Gordon & Rees's motion for summary adjudication of causes of action for an account stated and an open book account.  After Gordon & Rees dismissed its remaining causes of action, the court entered judgment and denied Lopez's postjudgment motions.  We find the existence of triable issues of fact precluded summary adjudication and reverse.[1]

## I.    BACKGROUND

A.    *Gordon & Rees's Representation of Lopez*

In September 2006, Gordon & Rees and Lopez entered into a written "Engagement Agreement" retaining the firm to provide advice on partnership matters relative to an art gallery, as well as other legal services that Lopez might request in future.  The Engagement Agreement provided, "Fees and expenses will be billed monthly and are due upon receipt," and included an arbitration provision.

---

[1] Because we reverse the summary adjudication order as against Lopez, we need not address his other claims of error.

1

Gordon & Rees partner Andrew D. Castricone represented Lopez in a business dispute involving the gallery. (*Campbell v. Lopez* (Super. Ct. S.F. City and County, 2008, No. CGC-07-463284 (*Campbell*).)[2] The case was scheduled for trial on January 22, 2008. In December 2007, Castricone sent Lopez a detailed report discussing the status of the litigation, analyzing Lopez's likelihood of success, projecting costs in the range of $235,000–260,000 if the case went to trial, and recommending pretrial resolution. The case settled on January 18, 2008. Among other terms, Lopez received a $50,000 cash payment and transfer of ownership of a painting known as "Piano and Man." A dispute over the settlement terms arose. The *Campbell* plaintiffs filed a motion to enforce the settlement agreement and called Castricone as a witness at a April 25, 2008 hearing on the motion. The court granted that motion, and judgment was entered for the *Campbell* plaintiffs. Gordon & Rees withdrew as counsel on April 28, 2008, and Lopez hired other counsel to pursue an appeal. Lopez subsequently accused Castricone of professional negligence in connection with the litigation and settlement and of breach of fiduciary duty.

B.    *Communications Regarding Amounts Due to Gordon & Rees*[3]

Lopez averred that "[d]uring the course of representation there were irregularities in the frequency of invoicing . . . . [T]he December 2006 invoice [was received] on April 24, 2007, three months late with no explanation. No invoice was generated or billed for August 2007. I continued to promptly pay all 2007 invoices sent to me; the last

---

[2] Gordon & Rees also provided services to Eric Koehler and named him as a codefendant in the complaint. Koehler was Lopez's domestic partner and anticipated business partner in the art gallery. Koehler and Lopez signed a conflict of interest waiver but Koehler never signed the Engagement Agreement or any other fee agreement with Gordon & Rees, and all invoices were in Lopez's name only. The trial court denied summary adjudication of the fee claims against Koehler, and Gordon & Rees apparently later dismissed those claims. Judgment was entered against Lopez alone. Accordingly, only Lopez is discussed in relation to the facts and issues raised on appeal.

[3] Lopez averred that Koehler's personal email address was used to correspond with Castricone so that the communications would remain confidential from opposing parties in the *Campbell* litigation. It is not disputed that electronic correspondence with Castricone from that address was authored or acknowledged by Lopez.

one was sent in November 2007 covering services performed through October 2007." He did not receive an invoice in December 2007 and, in response to Lopez's inquiry about the missing invoice, Castricone e-mailed a copy of the previously paid November 2007 invoice for $12,036.17 in fees and expenses billed through October 31, 2007. Even in the absence of a December 2007 invoice, Lopez sent Gordon & Rees $12,000 toward fees and expenses incurred in November 2007.

On January 17, 2008 (the night prior to a mandatory settlement conference in the *Campbell* litigation), Lopez e-mailed Castricone that December 2007 and January 2008 invoices had not been received for fees and expenses incurred in November or December 2007. In an e-mail sent at 11:27 p.m., Castricone confirmed no invoice had been sent in December and provided an estimate of the pending bills: "the next bill that covers the November/December time period . . . is for approximately $73K. . . . [As yet unbilled time] would translate to about $50K so far in January. If I am reading everything correctly, this all means that with the new bill (November/December), the total billed is about 140K. The unbilled (January + the brief time that was not previously billed, which is likely less than $5K) is $50K, putting you at around $195K through [January 17, 2008]. [¶] I'm going to send another email discussing numbers shortly in preparation for tomorrow, and will use $200K as the number for fees to (1) make math easier, and (2) include tomorrow's time too." Lopez averred that he did not see this e-mail prior to the settlement conference. Subsequent Gordon & Rees billings were as follows:

− An invoice dated January 18, 2008, reflected the $12,036.17 payment of the November 2007 invoice, and billed $72,555.30 for fees (dating Nov. 1–Dec. 31, 2007) and expenses (dating Oct. 25 & Nov. 6–21, 2007). Lopez averred that he first received an e-mail copy of this invoice in February 2008 and a printed version in April 2008.

− An invoice dated February 14, 2008, reflected payments received from Lopez in the amount of $52,000 (apparently comprised of the prior $12,000 payment and $40,000 from *Campbell* settlement proceeds), leaving a remaining balance of $20,555.30 from the January 18 invoice. $87,340.88 was billed for fees (dating Dec. 7–21, 2007, & Jan. 1–31,

3

2008) and expenses (dating Nov. 19–Dec. 31, 2007, & Jan. 7, 2008) for a total balance due of $107,896.18. Lopez claimed he first received a copy of this invoice on April 15, 2008.

– An invoice dated March 11, 2008, billed $6,901.08 for fees dating February 1– 26, 2008, and expenses dating June 14 and December 17–28, 2007, and January 2– February 28, 2008. The invoice indicated that the full balance of the February 14 invoice remained unpaid and the new balance due was $114,797.26.

– An invoice dated April 7, 2008, billed $799.88 for fees dating March 4–22, 2008, and expenses dating January 21–March 11, 2008. The full balance of the March 11 invoice remained unpaid and a new balance due of $115,597.14 was indicated. Lopez acknowledged receiving the April 7 invoice in April 2008.

On April 15, 2008, Castricone wrote by e-mail, under the subject line, "Fw: 75 day Notice": "Attached please find our outstanding invoices per [Lopez's] request. While it need not be paid in one chunk, we do need a substantial payment now and the balance in or very near full by 5/31." He sent a similar e-mail on May 1, 2008, and offered a discount if the balance was paid in full by May 31.

On May 7, 2008, Lopez wrote, "Had [I] received the invoices in a more timely manner, I don't think we'd be in this '75 day Notice' situation. [¶] You mention 'discounting the a/r if payment is made in full by May 31' in your message. What is the net amount due after the discount? [¶] In reviewing the invoices for January and February, [I] noticed 16 hours of your December time on the January invoice. Why is that? . . . [¶] [I am] also asking again, for the 4th time, for a time line of the trial preparation from May, 2007, through January, 2008. When were notices sent and discovery documents filed? Was there a timely service and follow-up to our discovery requests [in the *Campbell* litigation]? . . . It's not clear, from reviewing the invoices, when our discovery requests were filed and when (or if) they were answered."

On May 7, 2008, Castricone responded to Lopez, "As for the total amount, I do not understand the 'shock' as the amount tracks pretty closely with the estimated budgets we provided earlier and again in November and December. [¶] As for the timeline, we

4

can get that to you. . . . You will recall our discussion that [a party to the *Campbell* litigation] did not respond since he was dismissed before responses were due. [¶] As for the discount, we are presently authorized to accept $100K in fees (approximately $12K discount) + costs."

A May 8, 2008 invoice charged $805.25 for April fees and expenses and indicated the full balance of the April bill remained unpaid. The new balance was $116,402.39.

On May 16, 2008, Castricone wrote to Lopez, "I received [your] voice message regarding the status of the 'calendar' and payment of the outstanding invoices. We appreciate the fact that you are sending in the $5,000. . . . Have you considered settling [*sic*] the Piano and Man piece you offered to resolve the outstanding balance? [¶] . . . [¶] As for the calendar, . . . I am not sure if you are under the impression that such a calendar already exists, which it does not. Contrary to [your] assertion that it has not been sent yet because of something to hide, that is far from the case, and I believe you will concur that we were very candid with you about the case, the merits, the evidence, the cost of going forward, and issues regarding resolution. Rather, the problem is that it will have to be created manually, which will take a bit of time. I will likely have to prepare it myself . . . ."

Later the same day Lopez replied, "[I am] mailing a check for $5,000 today and will continue to make $5,000 monthly payments (more if possible) until the balance is paid off. *Piano and Man* is for sale and the offer is still open to Gordon and Rees to accept it as payment-in-full for [the] remaining balance. [¶] [W]hen [I] talked to [a Gordon & Rees paralegal] about getting the calendar . . . [she] said she had hand-written notes about [the] case and filing and due dates . . . . [¶] In [the paralegal's] entries on the G&R invoice for December, there are details, for example: [¶] . . . [¶] 12/19/07 Prepare calendar reflecting discovery, trial preparations [¶] 12/27/07 . . . Update case calendar . . . [¶] . . . [¶] It seems to [me] that the documentation [I am] looking for should already exist and may just need to be assembled."

In June and July 2008, Castricone and Lopez exchanged increasingly hostile e-mails regarding production of the timeline and the quality of Castricone's representation.

5

Lopez expressly asked Castricone to "[p]lease confirm that no deadlines were missed, all services proper and timely, etc.," and stated "future payments are contingent on receiving the work-product for which [I was] invoiced!" In a September e-mail, Castricone defended the terms of the *Campbell* settlement and the decision not to pursue claims against a certain individual, and he urged Lopez to resume payment. Castricone also represented that he had spent more than 20 hours of unbilled time to assemble a forthcoming 23-page timeline of the litigation. Castricone sent the timeline in October, which included summaries of his communications with Lopez and the rationale behind certain strategic decisions made during the *Campbell* litigation. Lopez promptly responded that the timeline did not include the information he was looking for and renewed his request for additional information. Castricone sent Lopez computer printouts of a case calendar and indices of pleadings filed and discovery exchanged during the *Campbell* litigation, and wrote that upon receipt of the information payment in full was expected.

Lopez responded in a November 10, 2008 e-mail that he needed time to reconcile the recently-produced information with his records "and gather [my] questions for you." Lopez reiterated that he would not make monthly payments while he worked on the reconciliation, but renewed his offer of the Piano and Man painting. Castricone responded by rejecting the offer of the painting but inviting offers of other art works to cover the balance. In a November 18 e-mail to Castricone, Lopez alleged the *Campbell* settlement amounted to a loss of that case and Castricone had concealed the high legal fees Lopez was incurring at the time of the settlement. Lopez suggested he might seek arbitration of the fee dispute and warned, "[I]t could turn out that your charges are considered excessive." Lopez reiterated that he needed time to reconcile the recently-produced information with his files, implied no additional payments would be made in the near future, and renewed his offer of the Piano and Man painting.

On January 2, 2009, Lopez wrote to Castricone by e-mail: "[I] find it **extremely** unprofessional that no one from the firm has contacted [me] in response to the [November 18, 2008 e-mail] nor to [my] follow-up phone call to you. [¶] Please note, [I]

6

wish to arbitrate Gordon & Rees invoicing and . . . rescind the offer to exchange *Piano and Man*." On February 28, Lopez sent Castricone a letter demanding arbitration. On March 12, 2009, counsel for Gordon & Rees sent Lopez a "***final demand*** for payment" of a $111,402.39 balance.

C.      *The Instant Lawsuit*

On January 6, 2012, Gordon & Rees sued Lopez for the $111,402.39 amount it had alleged to be due. Lopez represented himself in the action and continues to represent himself on appeal. In an October 2012 amended complaint, the firm alleged causes of action for breach of contract, account stated, open book account, and negligent misrepresentation. In May 2013, Gordon & Rees moved for summary adjudication of the account stated and open book account claims, claiming Lopez owed $110,158.53. The trial court granted the motion, ruling that the undisputed evidence established Lopez "assented to the $110,158.53 amount owed, and promised to pay the amount." Gordon & Rees dismissed the remaining claims and requested judgment be entered on the prior summary adjudication of the account stated and open book claims against Lopez. On September 18, 2013, the court entered judgment for Gordon & Rees against Lopez for $110,158.53 plus interest. Lopez's motions for reconsideration, vacating the judgment and new trial were all denied.

## II.      DISCUSSION

Summary adjudication of a claim is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "The party moving for summary [adjudication] bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fns. omitted.) "[I]f a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present

7

evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not . . . ." (*Id.* at p. 851.)  In ruling on the motion, the trial court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party, and an order granting summary adjudication is reviewed de novo.  (*Id.* at pp. 843, 860.)

A.    *Account Stated*

To prevail on a claim for an account stated, "it must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay to the creditor the amount thus determined to be owing." (*H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling Corp.* (1979) 99 Cal.App.3d 711, 726; see also *Gleason v. Klamer* (1980) 103 Cal.App.3d 782, 786 ["[a]n account stated is an agreement, based on the prior transactions between the parties, that the items of the account are true and that the balance struck is due and owing from one party to another"]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 972, pp. 1062–1063.)  "When the account is assented to, ' "it becomes a new contract.  An action on it is not founded upon the original items, but upon the balance agreed to by the parties . . . ."  Inquiry may not be had into those matters at all.  It is upon the new contract by and under which the parties have adjusted their differences and reached an agreement.' " (*Gleason v. Klamer,* at pp. 786–787.)  "The essential elements of an account stated are:  (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." (*Zinn v. Fred R. Bright Co.* (1969) 271 Cal.App.2d 597, 600.)  "The key element in every context is agreement on the final balance due." (*Maggio, Inc. v. Neal* (1987) 196 Cal.App.3d 745, 753.)

Gordon & Rees's separate statement of undisputed material facts in support of its motion for summary adjudication premised its account stated cause of action on the

8

following: "1. There were transactions between [Gordon & Rees] and [Lopez] establishing the relationship of [Lopez] as debtor and [Gordon & Rees] as creditor"; "2. There was an agreement between the parties on the amount due from the debtor [Lopez] to the creditor [Gordon & Rees]"; "3. There was a promise by the debtor, [Lopez], to pay the amount due"; and "4. The principal sum [Lopez] owes [Gordon & Rees] on the account is $110,158.53." Lopez does not seriously dispute allegations that he had a debtor relationship with Gordon & Rees as creditor. He does, however, dispute that the parties reached an agreement on the amount due, that he agreed to pay a fixed amount due, and that the amount due was $110,158.53.

As evidence of an agreed amount due, and Lopez's agreement to pay that amount, Gordon & Rees relies on its invoices, Lopez's May 16, November 10 and November 18, 2008 e-mails, and excerpts from Lopez's deposition testimony. In deposition, Lopez acknowledged that he received the April 7 and May 8 invoices in April and May 2008 respectively and that he made a $5,000 payment in May. Lopez initially answered "yes" to the question, "Did you ever make any payments on the invoice?" and added that he made the $5,000 payment, but he then clarified, "I can't say that it was toward any specific invoice. [I] just made a payment." When asked, "But it was a payment towards the amount Gordon & Rees said was owing?" he said "yes." Referencing the e-mails, Lopez acknowledged that he offered Gordon & Rees the Piano and Man painting and answered "yes" to the following questions: "[T]hat [offer] was to trade a painting in exchange for satisfying the amount due, they said was due?"; "[The Piano and Man painting] is the artwork that you were offering to pay off the balance?"; "[Y]ou were . . . offering to provide that painting in exchange for paying off the balance?"; and "In [the November 18] email are you asking Gordon & Rees to reconsider whether or not it should accept the 'Piano and Man' painting as payment of the balance?" In reference to the November 10 e-mail, Lopez was asked if he took the position at that time that he had no obligation to make payments to Gordon & Rees until the firm produced the timeline he had requested. He said he did not.

9

As evidence that no specific amount due had been agreed upon, Lopez cited his May 7 and 16, 2008 e-mails, Castricone's May 16 e-mail, and Lopez's declaration in support of his opposition to the summary adjudication motion. In the declaration, Lopez discussed his requests for a case calendar ("work product that pertained to items in the invoices and for which I was billed") and stated, "[M]y offer to pay $5,000 a month was conditioned on [Gordon & Rees] supplying the work product documents and assurances that deadline[s] were not missed." Lopez also averred that when he paid $5,000 in May 2008, "[t]his [wa]s the one, single instance in which . . . I advised [that I] would attempt to continue making such monthly payments. Shortly thereafter I rescinded the offer because [Castricone] was less than forthcoming in supplying answers to my questions."

Citing Gordon & Rees's evidence, the trial court ruled, "[Gordon & Rees] . . . produces several e-mails that [Lopez] assented to the $110,158.53 amount owed, and promised to pay the amount. [Citations.] The burden then shifts to Defendant Lopez to demonstrate that a triable issue of material fact exits. Defendant Lopez failed to produce admissible evidence showing that he did not assent to the amount owed on the invoice."

We consider separately whether the communications in May and November 2008 established an account stated as a matter of law.

1.      *Discrepancy in Balance Due*

As a preliminary matter, we note a discrepancy between the alleged balance due as stated in the May 2008 invoice (as adjusted by Lopez's $5,000 payment in May) and the complaint on the one hand ($111,402.39), and the amount stated in the motion for summary adjudication, the trial court's order granting the motion and the judgment ($110,158.53) on the other. The discrepancy raises an obvious question about whether the parties ever agreed on an amount certain due. "It is elementary law that a claim must be reduced to a *definite* amount by agreement between the parties before it can form a legitimate portion of an account stated." (*H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling Corp., supra*, 99 Cal.App.3d at p. 727.) However, we do not rely on the discrepancy alone in reversing the trial court's order.

10

### 2. *May 2008 Communications*

We agree the evidence shows Lopez acknowledged that he owed Gordon & Rees *something*. But we find Lopez's May 16, 2008 e-mail was insufficient to establish an account stated with an agreed balance because it was ambiguous both in its plain language and when read in context.

Lopez wrote in the May 16, 2008 e-mail, "[I am] mailing a check for $5,000 today and will continue to make $5,000 monthly payments (more if possible) until the balance is paid off." Gordon & Rees imply that "the balance" unambiguously refers to the balance set forth on the latest invoice Lopez had received (i.e., the $116,402.39 balance on the May 8 invoice), and that the statement was a promise to pay the full invoiced amount. However, Lopez's May 16 e-mail, taken in its entirety, reflected continuing concerns initially raised in his May 7 e-mail as to the necessity of work performed in December and whether work previously billed, particularly for discovery, had actually been performed. Lopez wrote on May 7 that when he received the April 7 invoice (for hours through March 31) he was "shocked to see an outstanding balance due of $115,597.14!" Lopez also expressly questioned certain hours included in the January and February invoices, and asked "for the 4th time for a time line of the trial preparation from May, 2007, through January, 2008." In the May 16 e-mail, Lopez continued to pursue documentation of work billed by Gordon & Rees.

A reasonable factfinder could infer from these communications that Lopez's concerns about Castricone's performance and the reasonableness of amounts billed had not been resolved, and that Lopez's $5,000 payment and offer of future payments did not express agreement with the total balance due as stated in the May 8, 2008 invoice. Rather, the payment and offer of future payments reasonably could be construed as an acknowledgment that *a balance* was due—the exact amount of which to be determined

11

once invoice disputes were resolved.  Lopez had, in fact, previously made payments to Gordon & Rees in anticipation of fees and costs not yet quantified or substantiated.[4]

The parties' May communications, therefore, raise at least a triable issue of fact as to whether Lopez agreed to pay the full amount of the May 8, 2008 invoice.  Authority cited by the trial court and Gordon & Rees do not convince us otherwise.  (*Gleason v. Klamer, supra,* 103 Cal.App.3d at pp. 785–786, 789–790 [client acknowledged in writing, "[the itemized billing statements] are in order, and I hereby acknowledge for payment by me as billed"]; *Truestone, Inc. v. Simi West Industrial Park II* (1984) 163 Cal.App.3d 715, 719–720, 725–726 [debtor's letter to creditor "acknowledge[d] that Truestone is a creditor for $17,898" and proposed a payment plan]; *Zinn v. Fred R. Bright Co., supra,* 271 Cal.App.2d 597, 599–602 [review of a trial court finding of fact for substantial evidence rather than a grant of summary adjudication].)

3.      *November 2008 Communications*

The November 2008 communications even more clearly evidence a dispute between the parties as to the amount owed.  Between June and November, Castricone and Lopez exchanged increasingly confrontational e-mails regarding production of the timeline and Castricone's quality of representation.  Lopez expressly asked Castricone to "[p]lease confirm that no deadlines were missed, all services proper and timely, etc.," and Lopez stopped making the promised monthly payments pending receipt of the timeline.  Lopez's November 18 e-mail to Castricone, which included a renewed offer of the Piano and Man painting, alleged the *Campbell* settlement amounted to a loss of that case; alleged Castricone had concealed the high legal fees Lopez was incurring at the time of

---

[4] Gordon & Rees suggests that Lopez's offer of the Piano and Man painting "as payment-in-full for [the] remaining balance" amounted to an admission that he owed at least the outstanding $111,402.39 invoice amount because Lopez claimed the painting's value was about $200,000.  However, the value of the painting was disputed.  Gordon & Rees twice concluded the painting would not cover the balance it claimed was due, and Lopez himself stated that he did not believe the painting could be sold for its full value in the then-current market.  As noted *post*, Lopez's offer of the painting reasonably could be construed as an offer of compromise, not an admission that any sum certain was due.

12

settlement; suggested that Lopez might seek arbitration of the fee dispute and warned, "[I]t could turn out that your charges are considered excessive"; reiterated that Lopez needed time to reconcile the recently-produced information with his files; and implied no additional payments would be made in the near future. This record easily supports an inference that the amount due from Lopez to Gordon & Rees remained in dispute as of November 2008, and that the November 18, 2008 offer of the painting was an offer of compromise, not an acknowledgement of the balance due on the most recent invoice.

In sum, triable issues of fact exist about whether Lopez's November 2008 communications created an account stated that Lopez owed Gordon & Rees an agreed amount of $111,402.39.

B.      *Open Book Account*

An open book account is "a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonably permanent form and manner . . . ." (Code Civ. Proc., § 337a.) A book account can be established by a course of dealing between the parties. (See *Warda v. Schmidt* (1956) 146 Cal.App.2d 234, 237.) "[T]he chief distinguishing characteristic differentiating a stated account from an open, current account" is that an "open account does not necessarily arise from the agreement of the parties." (*Mercantile Trust Co. v. Doe* (1914) 26 Cal.App. 246, 254.) "A book account may furnish the basis for an action on a common count ' " . . . when it contains a statement of the debits and credits of the transactions involved completely enough to supply evidence from which it can be reasonably determined what amount is due to the claimant." ' [Citations.] A book account is described as 'open' when the debtor has made some payment on the account, leaving a balance due." (*Interstate Group Administrators, Inc. v. Cravens, Dargan & Co.* (1985) 174 Cal.App.3d 700, 708.)

13

Gordon & Rees established the existence of an open book account between the firm and Lopez, as reflected in its invoices. Nevertheless, the accuracy of an alleged open book account is a question of fact, and a defendant is entitled to "attack each of the entries 'to show that the plaintiff has no right to recover or to recover to the extent that he claims.' " (*Interstate Group Administrators, Inc. v. Cravens, Dargan & Co., supra,* 174 Cal.App.3d at p. 708; *id.* at p. 704.) The firm's own evidence demonstrates that Lopez disputed the accuracy of at least some of the invoice entries, and Lopez produced additional evidence in opposition to the motion that draws into question the accuracy of the account, i.e., the reasonableness of charged fees. Thus, triable issues of fact were presented as to Gordon & Rees's right to recover the full amount set forth in its open book account, and the court erred in granting summary adjudication of this cause of action.

C.     *Lopez's Violation of Court Rules*

Although we grant Lopez relief in this appeal, we do not ignore his violation of procedural rules here and in the trial court. In the trial court, Lopez exceeded the page limits on his papers opposing summary adjudication, and the trial court refused to consider some of his arguments as a result. On appeal, Lopez filed an opening brief barely under the word limit; his briefs included excessive repetition; he failed to cabin his arguments to the appropriate sections of his briefs; and his section headings had little relation to where discussion of the issues might be found. (Cal. Rules of Court, rule 8.204.) Lopez's combined briefs were more than twice as long as the respondent's brief and imposed twice the burden in sorting out his legal arguments.

Pro se litigants are not entitled to special treatment and are required to follow court rules. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522–523.) This court may impose sanctions on a party or an attorney for "[c]ommitting any . . . unreasonable violation of these rules." (Cal. Rules of Court, rule 8.276(a)(4).) While we decline to impose sanctions at this time, we admonish Lopez that we may take a harsher view if confronted with similar conduct in any further proceedings before this court.

14

### III. DISPOSITION

The order granting summary adjudication as to Gordon & Rees's account stated and open book claims against Lopez and the September 18, 2013 judgment are reversed. The case is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. Gordon & Rees shall bear Lopez's costs on appeal.

_____

BRUINIERS, J.

WE CONCUR:

_____

SIMONS, Acting P. J.

_____

NEEDHAM, J.